## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

MICHELE WHITE,          )
                         )
          Plaintiff,     )
                         )
v.                      )     Civil Action No. 3:24-cv-725–HEH
                         )
JASON S. MIYARES, *et al.*,   )
                         )
          Defendants.  )

### MEMORANDUM OPINION
### (Granting Motion to Dismiss)

THIS MATTER is before the Court on Attorney General Jason S. Miyares and former Senior Assistant Attorney General Joshua N. Lief's (collectively, the "Prosecutor Defendants" or the "Prosecutors") Motion to Dismiss under Rule 12(b)(6) (the "Motion", ECF No. 24) filed on December 6, 2024. Although Defendants Investigator Mark P. de Almeida and Investigator Howard Mulholland are also named defendants in this case, they do not join the instant Motion. The Prosecutor Defendants and Plaintiff Michele White filed memoranda in support of their respective positions, and the Court held a hearing on March 18, 2025. For the following reasons, the Court will grant the Motion to Dismiss as to Defendant Miyares and as to Defendant Lief.

## I. BACKGROUND

When considering a Rule 12(b)(6) motion to dismiss, such as the one brought by the Prosecutor Defendants here, a court must assume that the plaintiff's well-pleaded allegations are true. *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 539 (4th Cir. 2013). Therefore, the Court recites the pertinent facts as alleged by Plaintiff in her Complaint.

Plaintiff Michele White ("Plaintiff") was employed as Prince William County's (the "County") General Registrar in 2015 and oversaw the 2020 Presidential and Special Elections (collectively, the "2020 Election") in the County. (Compl. ¶¶ 24–26.) Due in part to COVID-19-related social distancing requirements, the County used a special precinct for the 2020 Election known as the Central Absentee Precinct ("CAP or CAP Precinct"). (*Id.* at 30.) The CAP Precinct was "overseen by a senior Assistant Registrar, where elections officers (one from each major political party) opened returned absentee ballots and began the process of counting them, even before Election Day." (*Id.*) At the end of the 2020 Election, the Prince William County Electoral Board would report the County's election results to the Virginia State Electoral Board via an intermediary database and software system called the Virginia Election and Registration Information System ("VERIS"). (*Id.* ¶ 9.)

Election Day 2020 occurred on Tuesday, November 3, 2020. (Compl. ¶ 46.) As the polls closed, elections officers from each precinct in the County collected voting machine printouts and data, completed "Statement of Results" ("SOR") forms based on the voting machine printouts, and signed the completed SOR forms to verify the agreed-upon results. (Compl. ¶ 47.) According to Plaintiff's Complaint, "Following completion of the SOR forms, elections officers entered the unofficial results in a shared spreadsheet used by Ms. White [Plaintiff] and her staff to upload the same into VERIS." (*Id.* ¶ 49.) Officials at the CAP Precinct continued to process absentee ballots beyond Election Day because "one of the new state laws passed prior to the election required returned absentee ballots be counted and added to official vote counts if they were received by noon on Friday after the 2020 Election." (*Id.* ¶ 51.)

2

On November 4, 2020, the "canvassing" process began—which involved election officials reviewing, confirming, and certifying local election results. According to the Complaint, the County routinely requires manual changes to its VERIS data due to the County's large population and because it spans three (3) different federal congressional districts. (Compl. ¶¶ 56–65.) In 2020, election officials made numerous manual changes to the voting data in VERIS. (*Id.* ¶ 64.) One such change occurred on November 5 when Plaintiff "directed Assistant Registrar Sean Mulligan to manually update voting data in VERIS so that the distribution of total votes across the congressional districts would be accurate." (*Id.* ¶ 61.) Another occurred on November 7, 2020, when the Assistant Registrar overseeing the CAP Precinct, Colleen Rummell, and another official made changes to the data in that precinct. (*Id.* ¶ 64.)

On November 10, 2020, the County completed its canvassing process. (Compl. ¶ 66.) The next day, November 11, 2020, the Prince William County Electoral Board approved and signed the certified record of the results (the "Abstract of Votes") to the Virginia Department of Elections ("ELECT"), representing the county's official certification of its 2020 election results. (*Id.* ¶ 66.) On November 12, 2020, ELECT identified some errors in the County's data, primarily related to its entry of voter turnout. (*Id.* ¶ 68.) The County corrected those errors. (*Id.* ¶ 69.)

The SBE then certified the statewide results of the 2020 Election on November 18, 2020. (*Id.* ¶ 71.) However, on November 20, 2020, ELECT identified that, in two (2) precincts in the County, the vote tally had not been entered correctly, resulting in display errors on an unofficial election night result webpage. (*Id.* ¶ 75.) According to the

Complaint, "After being informed of these errors, Ms. White [Plaintiff] followed ELECT's instructions by correcting the errors in VERIS" and by arranging for a corrected Abstract of Votes to be sent to the County Electoral Board for approval, and then to the State Board of Elections ("SBE"). (*Id.* ¶ 76.) The Complaint further states, "On December 7, 2020, following standard procedure, the State Board of Elections met and recertified the corrected abstracts from Prince William County, as well as corrected abstracts of at least one other locality." (*Id.* ¶ 77.) This last correction did not change the outcome of the election as certified on November 18, 2020. (*Id.* ¶ 78.) At the time, neither ELECT nor the SBE referred these issues to Virginia's Office of the Attorney General ("OAG") for investigation. (*Id.* ¶ 79.)

The following year, Defendant Jason Miyares ("Miyares") was elected as Attorney General of Virginia. (Compl. ¶ 91.) According to Plaintiff, "Although Defendant Miyares has acknowledged the outcome of the 2020 presidential election, during his campaign, he pledged to investigate election fraud and cast doubt on the integrity of the 2020 Election, including on the debate stage." (Compl. ¶¶ 5, 91–92, 161.) After assuming office, Miyares hired new officials including Senior Assistant Attorney General Joshua Lief ("Lief"). (*Id.* ¶¶ 93–94.). Lief and Miyares, the Prosecutor Defendants, later formed an Election Integrity Unit ("EIU") within the OAG. (*Id.* ¶¶ 91, 102.)

In early 2022, Eric Olsen—Plaintiff's successor as General Registrar for the County—audited the County's 2020 Election results and data, finding a number of discrepancies. (Mem. in Supp. at 1, ECF No. 26; Compl. ¶¶ 109–13, 123–25.) For example, "according to Mr. Olsen's audit, there were 2,400 overcounted Trump votes and 1,600

4

undercounted Biden votes in the CAP Precinct data in VERIS, errors introduced by changes made to the VERIS data on November 7, 2020." (*Id.* ¶ 111.)

In addition to the alleged errors stemming from results in the CAP Precinct, Olsen's audit also identified other minor discrepancies for a few other non-CAP split precincts, not exceeding 51 votes in any one precinct, where the alleged errors marginally favored Biden. (*Id.*) None of the alleged discrepancies Olsen discovered were sufficient to change the outcome for Virginia in the 2020 election for the office of President of the United States. (*Id.* ¶ 112.) The Complaint states, "The net result of the alleged errors Mr. Olsen identified was an undercount for the entire county of 1,648 votes for Joseph R. Biden and an overcount for former [President] Donald J. Trump of 2,327 votes in a state that Biden had already won by a margin of several hundreds of thousands of votes." (*Id.*)

The Complaint alleges that the Prosecutor Defendants seized upon Olsen's audit to investigate and prosecute Plaintiff. (Compl. ¶ 114.) On April 13, 2022, Lief attended a closed meeting of the SBE, resulting in the SBE referring the matter of the County's election results to the OAG for investigation. (*Id.* ¶ 115; Mem. in Opp'n at 5, ECF No. 27.) Immediately after the SBE meeting, Plaintiff alleges, "an OAG investigation into election fraud during the 2020 Election in Prince William County was initiated, based solely on Mr. Olsen's audit." (Compl. ¶ 115.)

During the course of the investigation, Lief directed and supervised Investigator Mark de Almeida ("Investigator de Almeida") and Investigator Howard Mulholland ("Investigator Mulholland") (collectively, the "Investigators" or the "Investigator Defendants"). (*Id.* ¶ 116.) The Investigators forwarded evidence from witnesses directly to Lief as it was

gathered. (*Id.*) The Complaint states the Investigators were "Senior Financial Investigators" with experience "in Medicaid fraud and other white-collar crimes," but were not experienced in "Virginia election law, election administration, or election-related crimes." (*Id.* ¶ 106.)

Plaintiff alleges that, during the investigation, the Investigators "knowingly provided false and misleading information and omitted material information to prosecutors." (Compl. ¶¶ 120–49.) Defendant Lief then presented an indictment of Plaintiff to a grand jury. (*Id.* ¶ 150.) Plaintiff alleges that this presentation included the Investigators' false representations and omitted material information, such as Defendant de Almeida's testimony. (*Id.* 150–51.) The Complaint states that this testimony included, but was not limited to:

(a) Falsely stating that Ms. White directed Sean Mulligan to place errors into VERIS on November 7, 2020 in order to affect the outcome of the election;

(b) Falsely stating that entries in VERIS are "final election results" and are, therefore, a "statement" or "entry" within the meaning of Va. Code Ann. § 24.2-1016;

(c) Falsely stating that Ms. White intentionally prevented the verification of voting data in VERIS;

(d) Falsely stating that Ms. White instructed election workers not to record the date on which absentee ballots were returned and misleadingly omitting that Ms. White utilized an alternative procedure for processing returned absentee ballots that did not require physical date-stamping;

(e) Falsely stating that Ms. White prevented or caused the delay of reviewing the voter affirmations appended to returned absentee ballots, preventing such ballots from being cured and/or counted;

(f) Falsely stating that Ms. White instructed election workers to delete "Voter Credits" in VERIS in order to obscure her failure to timely process and/or count returned absentee ballots;

(g) Falsely stating that Ms. White failed to return valid out-of-jurisdiction ballots to their proper jurisdiction so that they could be processed and counted.

(Compl. ¶ 156.)

On September 7, 2022, Defendants acquired a grand jury indictment against Plaintiff. (Compl. ¶ 150–57.)  Plaintiff was indicted for two felonies and one misdemeanor: "False material statement or entry required by law (Va. Code Ann. § 24.2-1016)," "Corrupt conduct as an elected official (Va. Code Ann. § 24.2-1001.B)," and "Willful neglect of duties (Va. Code Ann. § 24.2-1001.A)".  (Compl. ¶ 151.)  The Prosecutor Defendants denied that they engaged in misconduct, instead stating that they eventually decided to drop the charges against Plaintiff because a key witness changed his story before trial.  (Mem. in Supp. at 1.) After motions by the OAG, the court dismissed the felony charges on December 1, 2023, and the misdemeanor charge on or about January 3, 2024.  (Compl. ¶¶ 173, 177.)

Plaintiff filed her Complaint on October 17, 2024, alleging malicious prosecution under 42 U.S.C. § 1983 against the Investigator Defendants (Count I), the same against the Prosecutor Defendants (Count II), and alleging malicious prosecution under Virginia law against all Defendants (Count III).  (Compl. ¶¶ 183–214.)  Plaintiff seeks civil damages, a declaration that her rights under the Fourth and Fourteenth amendments were violated, and attorney's fees.  In this suit, Plaintiff contends Defendants improperly and maliciously prosecuted her to "justify the existence of the Election Integrity Unit," and based on a sham investigation that was motived with "malice, spite, ill-will and wanton disregard" for her rights.  (Compl. ¶ 188.)  According to Plaintiff, the EIU was flawed because it lacked a "reporting structure or approval process for opening and conducting investigations," (*id.* ¶ 103), because it was inadequately staffed, and because the staff was inadequately trained.

(*Id.* ¶¶ 6, 103–05, 108, 114–15, 117–19.)  The Complaint states EIU did not provide "guidelines, procedures, training materials, or other similar documents." (Compl. ¶ 103.)

In their Motion to Dismiss, the Prosecutor Defendants argue that "nearly all of the alleged actions taken by Defendants Miyares and Lief fall within the scope of absolute prosecutorial immunity under both federal and state law." (Mot. at 1.)  In addition, the Motion contends the "remaining allegations cannot support a claim for relief or, in the alternative, Defendants Miyares and Lief are entitled to qualified immunity for those remaining allegations." (*Id.*)

## II. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) does not ask a court to determine whether a plaintiff's allegations are true; instead, it simply tests the sufficiency of a complaint. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992); Fed. R. Civ. P. 12. To survive a Rule 12(b)(6) motion, a "complaint must provide 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The facts alleged must be sufficient to "state all elements of [any] claim[s]." *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003).  When considering a Rule 12(b)(6) motion to dismiss, a court must accept as true all well-pleaded allegations. *Vitol, S.A.*, 708 F.3d at 539.  However, conclusory allegations enjoy no such deference. *Iqbal*, 556 U.S. at 678.  A court "need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Turner*, 930 F.3d at 644 (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).

At the motion to dismiss stage, a defendant may properly raise the issues of his immunity from suit and deficiencies in the plaintiff's pleadings as to proximate cause. *See Atkinson v. Godfrey*, 100 F.4th 498, 508 (4th Cir. 2024) (reversing a district court's denial of a motion to dismiss based on qualified immunity); *Nero v. Mosby*, 890 F.3d 106, 131 (4th Cir. 2018) (reversing a district court's denial of a motion to dismiss based on a prosecutor's immunity from suit); *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 495 (4th Cir. 2018) (affirming a district court's grant of a motion to dismiss for lack of proximate cause).

## III. ANALYSIS

### A. Section 1983 Claims

In her Complaint, Plaintiff advances a count of malicious prosecution under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments to the U.S. Constitution. "What is conventionally referred to as a '§ 1983 malicious prosecution' action is nothing more than a § 1983 claim arising from a Fourth Amendment violation." *Lambert v. Williams*, 223 F.3d 257, 260 (4th Cir. 2000). To prevail on such a claim, a plaintiff must ultimately prove that "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (citing *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012)).

#### 1. Absolute Immunity Under Federal Law

State prosecutors hold absolute immunity against federal civil liability suits that challenge the initiation and pursuit of a criminal prosecution. *Buckley v. Fitzsimmons*, 509

U.S. 259, 269–70 (1993) (citing *Imbler v. Pachtman*, 424 U.S. 409 (1976)).  The justification

for this doctrine has long been recognized.  As the U.S. Court of Appeals for the Fourth

Circuit has stated, "The public trust of the prosecutor's office would suffer if he were

constrained in making every decision by the consequences in terms of his own potential

liability in a suit for damages." *Nero*, 890 F.3d at 117 (citing *Imbler*, 424 U.S. at 424–25.)

"Without immunity from suit, this threat of retaliatory litigation would predispose

prosecutors to bring charges based not on merit but on the social or political capital of

prospective defendants." *Id.* (citing *Imbler*, 424 U.S. at 438 (White, J., concurring)).  The

absolute immunity doctrine "stems from courts' recognition that 'any lesser degree of

immunity could impair the judicial process itself.'" *Id.* (quoting *Kalina v. Fletcher*, 522 U.S.

118, 127 (1997)).

 This absolute immunity extends to actions "intimately associated with the judicial

phase of the criminal process." *Nero*, 890 F.3d at 117–18; *Imbler*, 424 U.S. at 430–31.  The

official claiming immunity bears the burden of showing that such immunity is justified.

*See Burns v. Reed*, 500 U.S. 478, 486 (1991).  When reviewing whether this standard is met,

courts first "look at the specific act challenged" and then determine what function was served

by that act. *Nero*, 890 F.3d at 118–20; *see Buckley*, 509 U.S. at 269, 271; *Burns*, 500 U.S. at

486.  If a prosecutor's actions served only an administrative or investigative function, then

absolute immunity may not apply. *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009).

This is because "[a] prosecutor's administrative duties and those investigatory functions that

do not relate to an advocate's preparation for the initiation of a prosecution or for judicial

proceedings are not entitled to absolute immunity." *Buckley*, 509 U.S. at 273 (citing *Burns,* 500 U.S. at 494–96).

The Supreme Court of the United States has thus held that absolute immunity does not apply "when a prosecutor gives advice to police during a criminal investigation, when the prosecutor makes statements to the press, or when a prosecutor acts as a complaining witness in support of a warrant application." *Van de Kamp*, 555 U.S. at 343 (cleaned up) (collecting cases). Absolute immunity also does not apply "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer . . . . Thus, if a prosecutor plans and executes a raid on a suspected weapons cache, he 'has no greater claim to complete immunity than activities of police officers allegedly acting under his direction.'" *Buckley*, 509 U.S. at 274 (quoting *Hampton v. Chicago,* 484 F.2d 602, 608 (7th Cit. 1973), *cert. denied*, 415 U.S. 917 (1974)).

On the other hand, prosecutors are immune when the challenged act is initiating a prosecution, presenting the state's case, or preparing for such proceedings. *Nero,* 890 F.3d at 118–19 (citing *Kalina*, 522 U.S. at 130.) As the Supreme Court has held, "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity." *Buckley,* 509 U.S. at 273; *see Van de Kamp*, 555 U.S. at 343; *Ostrzenski v. Seigel*, 177 F.3d 245, 250 (4th Cir. 1999). Absolute immunity applies when a prosecutor is evaluating evidence assembled by the police, *Buckley*, 509 U.S. at 273, deciding to seek an arrest warrant, *Kalina*, 522 U.S. at 130, and preparing and filing charging documents, *Nero*, 890 F.3d at 118–19. Even some supervisory roles which might appear to

be administrative have been held to be protected by absolute immunity. *See Van de Kamp*, 555 U.S. at 339–49. The Supreme Court has found prosecutors immune for failing properly to train prosecutors, failing properly to supervise prosecutors, and failing to establish an information system containing potential impeachment material about informants. *Id.*

Here, Plaintiff concedes that the Prosecutor Defendants are protected by absolute immunity for at least some of the conduct alleged in her Complaint, such as initiating charges and presenting evidence to the grand jury.[1] Plaintiff contends, however, that absolute immunity does not apply to the Prosecutors' actions that occurred before and during their investigation of Plaintiff. (Mem. in Opp'n at 7–8.) These include their acts of creating the EIU, directing its staff, and investigating Plaintiff. (*Id.*)

Specifically, Plaintiff alleges that the investigation and indictment against her were set in motion by the Prosecutor Defendants' actions of establishing the EIU "without any safeguards," "identifying investigative targets despite the absence of evidence of a crime," and "taking steps by and through that Unit [the EIU] to generate evidence of election fraud." (Mem. in Opp'n at 9.) Supporting these conclusions, Plaintiff contends, are the alleged facts that the EIU was structured "without clear procedures, training, or guidelines," and that its staff "lacked relevant experience in election law or administration or standard safeguards." (*Id.*) The Prosecutors wrongly identified Plaintiff as an investigation target, she argues,

---

[1] Specifically, Plaintiff "does not dispute that the act of initiating charges after reviewing the evidence produced during the formal investigation is protected by absolute immunity." (Mem. in Opp'n at 2). And Plaintiff states that she "does not rest her claim on the actual presentation of fabricated evidence to the grand jury." (*Id.* at 26.) Furthermore, the parties appear to agree that the Prosecutor Defendants are protected by absolute immunity as to any prosecutorial actions that occurred after the grand jury indictment in this case. (*Id.* at 2, n.1 ("Likewise, Plaintiff does not contest that acts occurring after an indictment are generally protected by absolute immunity.").)

12

because Olsen's audit revealed only minor election result discrepancies in the County where she was the Registrar. (*Id.* at 9–10.) In addition, Plaintiff states that the Prosecutor Defendants "used Olsen's audit as a pretext to secure a referral for a formal investigation" from the SBE. (*Id.*) Other conduct not protected by absolute immunity, Plaintiff argues, includes her allegations that Lief directed, supervised, and received evidence from the Investigators, and that while Lief was supervising the Investigators they "provided false and misleading information and omitted material information to prosecutors." (Compl. ¶¶ 115–16, 120.)

The Court finds that the Prosecutor Defendants are absolutely immune for much of the actions alleged in the Complaint. Indeed, under Supreme Court and Fourth Circuit precedent, the Prosecutors are absolutely immune for acts "intimately associated with the judicial phase of the criminal process," which covers a great deal of the conduct alleged. *See Imbler*, 424 U.S. at 430–31; *Nero*, 890 F.3d at 117–18. Thus, the Prosecutors are absolutely immune for preparing for and initiating charges, and for their prosecutorial acts that occurred afterwards. Also protected by this immunity are the Prosecutor Defendants' decisions regarding training and supervising subordinate prosecutors, and the creation of, or lack of, specific evidence management systems within the EIU. *See Van de Kamp*, 555 U.S. at 339–49. Collectively, these acts by the Prosecutors "fall squarely under the umbrella of absolute immunity." *See Nero*, 890 F.3d at 118–19; *Van de Kamp*, 555 U.S. at 339–43.

However, not all of the acts alleged within Plaintiff's § 1983 claim are barred by absolute immunity. Indeed, the Prosecutor Defendants concede that the immunity does not cover the actions they took before investigating Plaintiff. (Reply at 2–3, ECF No. 28.) In

13

addition, the Court finds that this immunity does not apply to Lief's acts in supervising the investigation of Plaintiff before Lief determined that he had probable cause. *See Buckley*, 509 U.S. at 274 (quoting *Hampton,* 484 F.2d at 608).

The Court is aware that Plaintiff made additional allegations, but those are conclusory, and the Court cannot assume they are true. The Complaint, building on Plaintiff's theory that the investigation against her was a sham, alleged in a section titled, "Count II – 42 U.S.C. § 1983" that "Defendant Lief directly participated in, and directed, the unlawful actions of the Defendant Investigators." (Compl. ¶ 197.) The Complaint then further alleged, "Defendants Miyares and Lief knew about, facilitated, approved, condoned and/or ratified the unlawful actions of the Defendant Investigators." (*Id.* ¶ 198.) The Court searched Plaintiff's Complaint and her brief for one or more specific facts supporting these conclusions, but it has found none. Under these circumstances, precedent from the Fourth Circuit and the Supreme Court establish that these allegations cannot be assumed to be true. *See Iqbal*, 556 U.S. at 680–81; *Nero*, 890 F.3d at 120, n.4. In *Ashcroft v. Iqbal*, the Supreme Court rejected conclusory allegations that claimed the parties: (1) "knew of, condoned, and willfully and maliciously agreed to subject [him]" to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest"; (2) that "Ashcroft was the principal architect of this invidious policy;" and (3) that "Mueller was instrumental in adopting and executing it." *Iqbal*, 556 U.S. at 680–81. The Supreme Court held, "These bare assertions, much like the pleading of conspiracy in *Twombly,* amount to nothing more than a 'formulaic

14

recitation of the elements' of a constitutional discrimination claim." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Similarly, in *Nero*, the Fourth Circuit stated:

> The Officers claimed that the State's Attorney's Office "manipulated evidence to facilitate [the] indictments," J.A. 176, that "Mosby created false facts and omitted material facts," J.A. 179, and that she "conduct[ed] a bogus and sham investigation," J.A. 179. But, absent specific supporting facts, these conclusory allegations are "not entitled to be assumed true."

*Nero*, 890 F.3d at 120, n.4 (quoting *Iqbal*, 556 U.S. at 681). Even more so than the allegations of misconduct in *Iqbal* and *Nero*, Plaintiff's vague, conclusory allegations that Defendants Lief and Miyares were involved in, or were aware of, unlawful conduct are insufficient to overcome a motion to dismiss. Furthermore, these conclusory allegations run counter to the Complaint's repeated, specific facts that the Investigators lied to prosecutors about what evidence they discovered. (Compl. ¶¶ 120, 127, 138, 140–41, 143–44, 149.) For all these reasons, the Court finds that Plaintiff has failed to make any well-pleaded or factual allegation that the Prosecutor Defendants directed, condoned, or even knew about the Investigators' alleged misconduct.

Thus, the Court now turns to reviewing whether the Prosecutor Defendants may be liable for those acts which fall outside the territory of absolute immunity, including creating the EIU, setting its framework and policies, and Lief's serving as supervisor of the investigation of Plaintiff.

### 2. Prosecutor Defendants' Other Defenses

For those actions not protected by federal absolute immunity, the Prosecutor Defendants argue that Plaintiff's § 1983 claim fails because (1) she has not met the standard

for a supervisory liability claim, (2) she has failed to plead that the Prosecutor Defendants

were the proximate cause for her seizure, and, in any case, (3) her claim is barred by

qualified immunity. (Mem. in Supp. at 10.) The Court reviews each argument in turn.

### a. Supervisory Liability

Plaintiff's claims regarding the EIU's alleged lack of sufficient policies, reporting

structure, approval processes, guidelines, procedures, instruction materials, staffing, training,

and oversight are the province of a supervisory liability claim under § 1983. *See, e.g.*,

*Connick v. Thompson*, 563 U.S. 51, 61 (2011) (failure to train); *Bd. of Cnty. Comm'rs of

Bryan Cnty. v. Brown*, 520 U.S. 397, 400 (1997) (hiring and training decisions); *Danser v.

Stansberry*, 772 F.3d 340, 350 (4th Cir. 2014) (presence or lack of policy); *Shaw*, 13 F.3d at

797 (failure to train, supervise, and discipline); *Slakan v. Porter*, 737 F.2d 368, 371 (4th

Cir. 1984) (failure to enact regulations). Plaintiff, however, opposes this construction of her

case. (Mem. in Opp'n at 2, "Ms. White does not seek to hold Lief and Miyares accountable

simply as supervisors (*i.e.*, their failures to act or intervene)".) She clarified in her brief that

her claim is not based on supervisory liability but instead rests on the theory that the

Prosecutor Defendants "*themselves* caused Ms. White's seizure." (*Id.* 10–11 ("Unlike in

cases involving mere supervisory liability, *see* Mot. 8-9, the Complaint alleges Miyares and

Lief actively set in motion the unlawful investigation that foreseeably resulted in Ms.

White's indictment.").) Parties are responsible for advancing their own case, and the Court

will not interrupt Plaintiff from choosing to waive this avenue of relief. [2]

---

[2] In any case, Plaintiff's Complaint fails to state a claim for supervisory liability. Plaintiff has not
pled a pattern of wrongful conduct that occurred before her alleged constitutional violations. *See
Danser*, 772 F.3d at 350. Moreover, Plaintiff has not shown that the Prosecutor Defendants were

### b. Proximate Cause

The first element of a malicious prosecution claim under §1983 requires a plaintiff to prove that the defendant was the but-for and proximate cause of her unlawful seizure. *Evans*, 703 F.3d at 647. "Accordingly, subsequent acts of independent decision-makers (*e.g.*, prosecutors, grand juries, and judges) may constitute intervening superseding causes that break the causal chain between a defendant-officer's misconduct and a plaintiff's unlawful seizure." *Id.* The Fourth Circuit has stated that an intermediary's independent decision to prosecute insulates an officer from a malicious prosecution claim "unless the officer [1] concealed or misrepresented facts or [2] brought such undue pressure to bear on the intermediary that the intermediary's independent judgment was overborne." *Id.* at 648 (quoting *Snider v. Lee*, 584 F.3d 193, 206 (4th Cir. 2009) (Stamp, J., concurring)). For example, although a grand jury indictment usually establishes the existence of probable cause and thus insulates the arresting officers, "a grand jury's decision to indict will not shield a police officer who deliberately supplied misleading information [or failed to supply relevant information] that influenced the decision." *Trail v. Cressell*, No. 20-2219, 2021 WL 4957607, at *2 (4th Cir. Oct. 26, 2021) (alteration in original) (quoting *Massey v. Ojaniit*, 759 F.3d 343, 356–57 (4th Cir. 2014)).

---

aware of the alleged misconduct upon which Plaintiff bases her claim for a constitutional injury. *See Johnson v. Robinette*, 105 F.4th 99, 123 (4th Cir. 2024) (requiring knowledge of misconduct to establish supervisory liability). The facts alleged in the Complaint do not show that the Prosecutor Defendants knew evidence was fabricated or omitted before Plaintiff was charged. *See supra* Part III.A.1. As previously discussed, the Complaint continuously alleges that the Investigator Defendants lied to prosecutors about what evidence was gathered during the investigation and about the weight of the evidence that they did bring forward. (Compl. ¶¶ 120, 127, 138, 140–41, 143–44, 149.) Overall, the Complaint fails to show a causal link between the Prosecutor Defendants and the alleged fabrication and omission of evidence by the Investigators, let alone a pattern of such behavior, or that the one seizure pled here is otherwise sufficient to apply supervisory liability.

Even though Plaintiff forgoes a supervisory liability claim here, it is possible for a plaintiff to obtain recovery on a theory of "effective causation." *See Amisi v. Brooks*, 93 F.4th 659, 670 (4th Cir. 2024). "Section 1983 creates liability not just for a state actor who *directly* deprives a plaintiff of her rights, but one who 'causes' such a deprivation." *Id.* (emphasis in original). For example, the Supreme Court has recognized that an officer who submits a warrant affidavit without reasonable grounds for probable cause can be liable under § 1983, even if he does not personally make the unlawful arrest. *Malley v. Briggs*, 475 U.S. 335, 337 (1986). The requisite causal connection for this theory can be established when actors "set[ ] in motion a series of acts by others which the actors know or reasonably should know would cause others to inflict the constitutional injury." *Amisi*, 93 F.4th at 670. Thus, the question here is whether the Prosecutor Defendants reasonably knew that their actions would cause others to unlawfully seize Plaintiff.

Plaintiff argues that the manner in which the Prosector Defendants created and managed the EIU proximately caused unlawful actions that resulted in Plaintiff being indicted and seized without probable cause. (*See* Compl. ¶¶ 194–205.) In Plaintiff's view, it was natural and foreseeable for the Investigators to fabricate incriminating evidence and conceal exculpatory evidence due to how the Prosecutors structured the EIU, due to the unit's lack of adequate staff, training, and policies, and due to the fact that Lief was the attorney supervisor for Plaintiff's investigation. (Mem. in Opp'n at 12–13 (citing Compl. ¶¶ 6, 103–07, 114–19, 195).) By these actions, Plaintiff contends, the Prosecutor Defendants caused her to be seized without probable cause. (*Id.*)

Plaintiff's theory is fatally attenuated. Proximate cause "require[s] consideration of the 'foreseeability or the scope of the risk created by the predicate conduct'" and a "conclu[sion] that there was 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Cnty. of Los Angeles v. Mendez*, 581 U.S. 420, 431 (2017) (citation omitted). Applying this standard, courts require a close connection between the defendant's act and the constitutional injury—even under an "effective causation" theory. *See Amisi*, 93 F.4th at 670. For example, in *Amisi*, the Fourth Circuit found that the pleadings showed that a corrections officer, Townsend, effectively caused an unlawful seizure when he signaled a second corrections officer to take an inmate into a locker room where Townsend knew that officer usually performed strip searches. *Id.* Similarly, in *Riddick v. Barber*, the Fourth Circuit held that a detainee established causation when he "allege[d] specifically that he was 'placed into 4-point restraints indefinitely' at the 'directive' of both" a Virginia state department commissioner and the director of the hospital where the plaintiff was confined. 109 F.4th 639, 650 (4th Cir. 2024). Plaintiff has made no sufficient allegation that either Lief or Miyares directed the Investigators to conceal or omit evidence. Likewise, she has alleged no other particular act that shows they acted unlawfully or directed others to do so. Thus, she has failed to show that the Prosecutors "set[ ] in motion a series of acts by others which the actors know or reasonably should know would cause others to inflict the constitutional injury." *See Amisi*, 93 F.4th at 670.

Although Plaintiff specifically alleged that the EIU's policies and training were inadequate, such a theory of causation essentially boils down to a municipal-liability-type claim, even though Plaintiff brings this claim against the Defendants in their individual

capacities. (Compl. ¶¶ 15–16.) When a plaintiff challenges a general policy or similarly broad government action that is "itself legal" by alleging that it ultimately resulted in a constitutional violation, the Supreme Court has explained that there exist "a series of events" that attenuate causation. *Bryan Cnty.*, 520 U.S. at 405. Thus, where a plaintiff alleges that the cause of her constitutional deprivation is a policy, a training program, or a lack of either, the Supreme Court has required that the plaintiff show both that a "pattern of constitutional violations" put the § 1983 defendants on notice of the deficiency, and that the defendants failed to address that deficiency. *See id.* at 407–08 ("Because the decision necessarily governs a single case, there can be no notice to the municipal decisionmaker, based on previous violations of federally protected rights, that his approach is inadequate.") Plaintiff has pled one seizure here, not a pattern of unlawful seizures or other misconduct. In sum, Plaintiff has failed to plead sufficient facts for the Court to find that the lawful actions by the Prosecutor Defendants before and during Plaintiff's investigation directly or proximately caused her to be seized without probable cause.

Furthermore, Plaintiff's theory of the case runs headlong into a glaring, superseding cause: the alleged unlawful acts by the Investigators. According to the Complaint, Investigators reported that Assistant General Registrar Sean Mulligan would testify that Plaintiff directed him to make changes to VERIS data for the CAP Precinct on November 7—a day corresponding to one of the discrepancies identified by Olsen's audit. (Compl. ¶¶ 33, 64, 111.) The Complaint alleges this report was false, and that Mulligan never made such a statement. (*Id.* ¶¶ 122–23.) Plaintiff further asserts that during their investigation, the Investigator Defendants "had evidence that exonerated Ms. White

[Plaintiff]" but "did not provide this information to prosecutors when presenting the conclusions of their investigation." (*Id.* ¶¶ 33–34.) Moreover, Plaintiff makes these allegations the linchpin facts in her Complaint, stating that "[t]he malicious prosecution of Ms. White resulted *directly from the misconduct of Defendant Investigators de Almeida and Investigator Mulholland*, who knowingly provided false and misleading information and omitted material information to prosecutors" which later resulted in a grand jury indictment. (Compl. ¶ 120 (emphasis added).)

These alleged acts of fabricating and concealing evidence are the type of intentional, unlawful acts that "break the causal chain" for an unlawful seizure claim. *See Evans*, 703 F.3d at 647. Plaintiff argues that the causal chain is not broken here, however, because the Prosecutor Defendants "pressured" the Investigators "to deliver results," and thus it was foreseeable that they would violate the law. (Mem. in Opp'n at 12.) The Complaint shows that the Prosecutors were eager to investigate claims of election fraud in the Commonwealth. (Compl. ¶¶ 5–6, 92–93, 97, 114, 160–163.) In addition, it is a fair inference that the Investigators were under pressure to find whatever evidence of election misconduct existed and to compile it in preparation for potential criminal charges. (*See id.*) But Plaintiff asks the Court to conclude that by creating what she alleges was a high-pressure environment, the Prosecutors should have known their investigators would engage in immoral and unlawful conduct that would taint their investigations. Without any prior sign of such behavior by the Investigators, this inferential leap is much too far. Many government agencies expect results, build a high-pressure environment, and report directly to an elected official. That is not

enough to make it reasonable and foreseeable to presume that the officials working there are breaking the law.

This result is unchanged by Plaintiff pleading that Lief was hands-on with the Investigators, and that Lief was more involved in the investigation than other prosecutors. (*See* Compl. ¶¶ 115–16.) The Court does not find it reasonable or appropriate to conclude that a prosecutor's increased involvement in an investigation means that he should suspect that officers under his supervision would engage in misconduct—let alone begin fabricating evidence. The Fourth Circuit has previously rejected the idea that prosecutors should face greater liability for participating in an investigation, and instead has found that, on occasion, it is their duty to do so. *See Nero*, 890 F.3d at 120 (finding that a § 1983 claim against a prosecutor for "conducting an investigation is not actionable[.]").

Consequently, the factual allegations in the Complaint fail to show that the Prosecutor Defendants were the proximate cause of Plaintiff's claimed injury.

### c. Qualified Immunity

Qualified immunity protects government officials from civil liability. *Nero*, 890 F.3d at 120; *see Burns*, 500 U.S. at 492–96 (affording qualified immunity to prosecutors for actions taken outside the judicial phase of criminal proceedings). Unlike absolute immunity, the question for qualified immunity is not what function a prosecutor served when he acted, but rather, whether the prosecutor's actions clearly violated constitutional law. As the Supreme Court has stated, "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal

before the commencement of discovery." *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

The qualified-immunity inquiry asks whether "the facts alleged show the officer's conduct violated a constitutional right" and, if so, "whether the right was clearly established." *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001). If the answer to either question is "no," then qualified immunity applies and the official is immune from suit. *See Pearson v. Callahan*, 555 U.S. 223, 236–42 (2009). If the law did not put the officer on notice that his conduct would be clearly unlawful, then finding that the officer is protected by qualified immunity is appropriate. *See Saucier*, 533 U.S. at 202 (citing *Malley*, 475 U.S. at 341 (stating that qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law")). To state it differently, "[a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Even where a constitutional right is clearly established as a general matter, the Court must determine whether it is specific enough that a reasonable official committing the defendant's actions "would have understood that what he or she is doing violates that right." *Atkinson*, 100 F.4th at 505 (quoting *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018)). "[C]ourts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *D.C. v. Wesby*, 583 U.S. 48, 63–64 (2018) (quoting

*Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). Thus, for Plaintiff's right to be clearly

established here, there must be caselaw or other similar authority not just about the general

principle that a prosecutor violates the Fourth Amendment by prosecuting a citizen without

probable cause; but instead, "the law must establish that conduct similar to [the Prosecutor

Defendants'] is unconstitutional." *Atkinson*, 100 F.4th at 505.

The Prosecutor Defendants argue that qualified immunity protects them from

Plaintiff's claims here because their actions were lawful—and thus, clearly not

unconstitutional. (Mem. in Supp. at 10.) They state, "It is plainly lawful to create a new

investigative unit consistent with the Attorney General's statutory duties, *see* Va. Code

§ 24.2-104(A), (B), staff it as necessary, *see Bryan Cnty.*, 520 U.S. at 405, and train the same

staff." (*Id.*; *see also Nero*, 890 F.3d at 12 (stating that prosecutors enjoy qualified immunity

for beginning an investigation before they have probable cause).) "At most," they contend,

Plaintiff "has alleged that Attorney General Miyares and Lief poorly executed these tasks,

but that is not unconstitutional or a violation of clearly established law." (*Id.*)

In response, Plaintiff argues that the Prosecutor Defendants have not established

qualified immunity for all their actions. (Mem. in Opp'n at 19–20.) She recites that the right

to be free from an arrest effected without probable cause is clearly established. (*Id.* at 20

(citing *Merchant v. Bauer*, 677 F.3d 656, 662 (4th Cir. 2012)).)[3] Here, Plaintiff argues that

the manner and the context in which the Prosecutors created and directed the EIU unlawfully

set in motion her criminal prosecution. (*Id.* at 20–21.) While Plaintiff's brief is not exactly

---

[3] The Court likewise assumes *arguendo* that the right to not be deprived of one's liberty by
fabrication of evidence is clearly established. *See Willis v. Blevins*, 957 F. Supp. 2d 690, 703 (E.D.
Va. 2013); Mem. in Opp'n at 20.

24

clear, she appears to argue that the Prosecutor's actions here rendered qualified immunity inapplicable because, she alleges, the EIU was created with political motives and subsequent evidence fabrication occurred within that Unit. (*Id.* at 21 ("Plaintiff does not seek to attach civil liability to the mere fact the Attorney Defendants created the Unit but rather to the broader course of unlawful conduct underlying the shambolic and politicized nature of the Unit's creation, which proximately caused Plaintiff's indictment.").)

Here, the flaw underlying Plaintiff's theory of the case emerges once again. She does all except make a well-pleaded allegation that either Prosecutor Defendant fabricated or hid evidence, directed others to do so, or discovered that evidence was fabricated or hidden before charging Plaintiff with a crime. *See supra* Part III.A.1. Thus, throughout her Complaint, her brief, and oral argument, she consistently relies upon a hypothesis that— although the Prosecutors had the lawful authority to create the EIU and to investigate alleged election fraud—it was both the high-pressure manner in which they did so and their motivations that make their actions unconstitutional. For this theory, Plaintiff cites no clear authority. As the Fourth Circuit has stated, for qualified immunity to not attach "the law must establish that conduct similar to [the Prosecutor Defendants'] is unconstitutional." *See Atkinson*, 100 F.4th at 505; *al-Kidd*, 563 U.S. at 741. That standard is not met here. Instead, a review of Plaintiff's well-pleaded facts shows that qualified immunity applies.

Consequently, the Court finds that qualified immunity bars Plaintiff's claims against the Prosecutor Defendants.

## B. Plaintiff's State Law Claims

In Count III of her Complaint, Plaintiff contends that Defendants maliciously caused her to be arrested and indicted without probable cause in violation of her "rights under state law." (Compl. ¶¶ 206–14.) In a Virginia tort action for malicious prosecution, the plaintiff has the burden of proving four (4) essential elements: "that the prosecution was (1) malicious, (2) instituted by or with the cooperation of the defendant, (3) without probable cause, and (4) terminated in a manner not unfavorable to the plaintiff." *Reilly v. Shepherd*, 643 S.E.2d 216, 218 (Va. 2007).

The Prosecutor Defendants argue that Count III should be dismissed on grounds of state absolute immunity—in the form of both sovereign immunity and prosecutorial immunity. (Mem. in Supp. at 15–19.) In opposition, Plaintiff argues that the elements of a state law malicious prosecution claim are met here, that the Prosecutors are not protected by prosecutorial immunity for their actions of creating the EIU and investigating Plaintiff, and that sovereign immunity does not protect them from the intentional misconduct alleged here. (Mem. in Opp'n at 27–30.)

For state law claims, Virginia's absolute immunity applies to certain state officers who are sued in their official or individual capacities for acts they performed as part of their government role. *See Messina v. Burden*, 321 S.E.2d 657, 661 (Va. 1984); *Perry v. Virginia*, No. 117CV546AJTJFA, 2017 WL 6759618, at *4 (E.D. Va. Nov. 9, 2017) (finding that a judge is entitled to absolute immunity in both his individual and official capacities). This has been made clear in the context of the judicial immunity doctrine. *Harlow v. Clatterbuck*, 339 S.E.2d 181, 184 (Va. 1986) ("It is clear that judges enjoy absolute immunity from civil

liability, even when they act maliciously or corruptly or in excess of their jurisdiction. Judges can be held liable only when they act in 'clear absence of all jurisdiction.'")

The Supreme Court of Virginia has held that a form of absolute immunity applies not only to judges, but to other high level government officials: "Governors, judges, members of state and local legislative bodies, and other high level governmental officials have generally been accorded absolute immunity." *Messina*, 321 S.E.2d at 661. Included in the list of "high level government officials" are officers from the Governor down through, at least, the Executive Secretary of the Water Control Board. *All. to Save the Mattaponi v. Commonwealth, Dep't of Env't Quality ex rel. State Water Control Bd.*, 621 S.E.2d 78, 96 (Va. 2005) ("We also hold that the Board's Executive Secretary is immune from suit."). The Court finds that the Supreme Court of Virginia would consider its Attorney General—an officer elected on a statewide basis in the same manner as the Governor—a high level government official entitled to absolute immunity from suit. *See Messina*, 321 S.E.2d at 661; Va. Const. art. V, § 15 ("An Attorney General shall be elected by the qualified voters of the Commonwealth at the same time and for the same term as the Governor.").

A form of absolute immunity also applies to front-line prosecutors. *Andrews v. Ring*, 585 S.E.2d 780, 784–85 (Va. 2003) ("The common-law immunity of a prosecutor is based upon the same considerations that underlie the common-law immunities of judges and grand jurors acting within the scope of their duties." (quoting *Imbler*, 424 U.S. at 422–23).) Virginia's Supreme Court has clearly stated, "In each case where a prosecutor is involved in the charging process, under Virginia law, that action is intimately connected with the

prosecutor's role in judicial proceedings and the prosecutor is entitled to absolute immunity from suit for such actions." *Andrews*, 585 S.E.2d at 785.

Notably, this immunity covers an essential element of Plaintiff's Virginia malicious prosecution claim: that Lief was the one who initiated the criminal prosecution against her. *See Reilly*, 643 S.E.2d at 218; *Donohoe Const. Co. v. Mount Vernon Assocs.*, 369 S.E.2d 857, 862 (Va. 1988) (clarifying that malicious prosecution lies for the initiation of criminal charges, whereas a different tort, abuse of process, applies to actions that occur after criminal charges are issued.). That is, unlike her § 1983 claim under the Fourth Amendment, Plaintiff's state law claim does not rest on whether she was unlawfully seized, but whether the Prosecutor Defendants may be held liable for initiating charges. For that action, Virginia law grants the Prosecutor Defendants absolute immunity. *See Andrews*, 585 S.E.2d at 784–85. Plaintiff has not identified authority that allows her to make an end run around this state immunity, which courts have recognized is broader than prosecutorial immunity based on federal law. *See King v. Darden*, No. 3:17-cv-742, 2018 WL 3651590, at *6 (E.D. Va. Aug. 1, 2018) ("Virginia law provides even broader prosecutorial immunity" than federal prosecutorial immunity (citing *Andrews*, 585 S.E.2d at 785)). Furthermore, the immunity serves a good and critical role by "ensuring that the prosecutor is not deterred from doing his duty by fear of retaliatory lawsuits from those he had accused whose charges were later dismissed or who were acquitted." *See Viers v. Baker*, 841 S.E.2d 857, 862 (Va. 2020) (acknowledging that "the underlying policy justifications for judicial immunity also applied to prosecutors"). The Court has found no authority authorizing the Court to effectively strip

a prosecutor of this protection by ignoring his act of presenting the charges to a grand jury, and, instead, reviewing only his conduct that occurred before he initiated these charges.

Consequently, the Court finds that both Prosecutor Defendants are absolutely immune from a Virginia malicious prosecution claim for the conduct alleged in the Complaint.

## IV. CONCLUSION

In sum, the Prosecutor Defendants, like all prosecutors, are absolutely immune for initiating criminal charges against Plaintiff and pursuing that criminal prosecution. Likewise, they are shielded by qualified immunity for creating the EIU, setting its framework and policies, and beginning and supervising the investigation of Plaintiff as these actions were not unlawful and did not amount to clear violations of her constitutional rights. Her state law claims, as the Court explained, are barred by absolute immunity under state law stemming from sovereign immunity and the immunity of prosecutors. Furthermore, her Complaint fails to allege facts the Court can rely upon to find proximate cause. Of course, Plaintiff has raised serious allegations that the Investigators fabricated incriminating evidence, that they concealed or misrepresented exculpatory evidence, that they lied to prosecutors about the evidence, and that these actions resulted in an arrest without probable cause. The Investigators whom Plaintiff alleges engaged in this behavior remain named defendants in this case. However, her allegations do not license her to render the chain of command within a prosecutor's office liable for civil damages without facts showing a sufficient connection to such inappropriate conduct. Thus, she has failed to state a claim for malicious prosecution under both § 1983 and state law against Attorney General Miyares and former Senior Assistant Attorney General Lief.

For all these reasons, the Court will grant the Motion to Dismiss as to both Defendant Miyares and Defendant Lief. Because the Prosecutor Defendants are immune from suit based on Plaintiff's pleaded facts and because those immunities are sufficient to grant the Motion to Dismiss in full, the matter against them will be dismissed with prejudice.

An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: June 5 2025
Richmond, Virginia

30