## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| MICHELE WHITE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 3:24-cv-725–HEH |
| | ) |
| JASON S. MIYARES, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION
### (Granting Motion for Summary Judgment)

THIS MATTER is before the Court on Defendants Mark de Almeida and Howard Mulholland's (collectively, the "Investigators" or the "Defendants") Motion for Summary Judgment (ECF No. 60). The Defendants and Plaintiff Michele White ("White") filed memoranda in support of their respective positions. After hearing oral argument from the parties on July 22, 2025, the Court granted the Defendants' Motion for Summary Judgment for the reasons articulated below.

### I. BACKGROUND

Elections in Virginia are administered by the State Board of Elections ("SBE") and local officials. Va. Code §§ 24.2-102, 24.2-103, 24.2-106. The duties of the SBE are carried out by the Department of Elections ("ELECT"). *Id.* Each city or county in Virginia also has a local electoral board comprised of three (3) members that are supervised by the SBE. *Id.* These local boards appoint a General Registrar to carry out their operations. *Id.*; Va. Code §§ 24.2-110, 24.2-114(18).

1

Virginia law requires that a locality's General Registrar report election results to ELECT by precinct. Va. Code. § 24.2-667.1; *see* Ex. 35 at Ch. 3.3.4.5. Some precincts are considered "split precincts," where the boundary of a federal congressional district divides the population. Although two voters who reside in different congressional districts may vote at the same precinct, they will have different candidates reflected on their ballots. That precinct, then, would be required to prepare a different ballot for each congressional district and to account for that fact when recording vote totals. (Eric Olsen Dep. at 56–57; 209, Ex. 38; Email from ELECT official, Ex. 40.)

To obtain the results of an election, ballots are fed into voting machines that read and tally the votes, and those machines print physical tapes called "tally tapes." (Olsen Dep. at 98–101; Investigators' SOF ¶ 9; White's SOF ¶¶ 7–8, 36.) Officials can count vote totals using these tally tapes. (Olsen Dep. at 97–101; Investigators' SOF ¶ 9; White's SOF ¶¶ 7–8, 36.) Tally tapes can be printed in "detailed" or "summary" form, with an important difference being that "detailed" tapes include results listed by congressional district, whereas "summary" tapes do not. (White's SOF ¶ 8; Olsen Dep. at 55–60, 153, 253–54; Sean Mulligan Dep. at 218–219, Ex. 37.)

After an election is complete, the staff of a local election office conduct a "canvass" process, which is also referred to as an "ascertainment" process. (Olsen Dep. at 63, 115.) During the canvass, election officers review, confirm, and record the official local results of the election. (ELECT Handbook § 14.1; Ex. 5.) ELECT and local election officials use a database called the Virginia Elections Registration Information System ("VERIS") to track voter registration, record election results, and track mail-in ballots. (Olsen Dep. at 24; Mulligan Dep. at 32–34, 55, 237–238; Investigators' SOF ¶ 14; White's SOF ¶ 36.) The data

2

in VERIS is used to create "abstracts" following the canvass process, which are the official reports of election results from the local electoral board. (Olsen Dep. at 116–17; Mulligan Dep. at 55; Investigator's SOF ¶ 17; White's SOF ¶ 36.) The abstracts are then submitted to the local electoral board to certify the results of the election. (ELECT Handbook §§ 14.2.2.2, 14.2.2.5, 14.3.3; Mulligan Dep. at 55.) Because, in November 2020, electoral board members were barred from having access to VERIS, they relied on the local registrars to provide them with the information available on that system. (Olsen Dep. at 65, 246–47; Investigators' SOF ¶ 19; White's SOF ¶ 36.)

For the November 2020 general election, which included the election for President of the United States, White was the General Registrar of Prince William County (the "County"). After Virginia enacted changes to statutes that governed elections ahead of the November 2020 election, and due in part to COVID-19-related social distancing requirements, ELECT created new guidance. (White's SOF ¶¶ 1–2; Ex. 35 at Ch. 12, app'x C.) General registrars retained significant discretion, including determining when to begin pre-processing of absentee ballots before election day, which was November 3, 2020. (White's SOF ¶ 2; Ex. 35 at Ch. 12, app'x C.)

In Prince William County, White determined that some processes from prior elections were extraneous and decided to cut or modify them for the November 2020 election. (White's SOF ¶ 6.) For example, White directed staff in the Prince William Office of Elections ("PWOE") to proofread ballots electronically on VERIS rather than on hardcopy. (*Id.*; Investigators' SOF ¶ 57.) Another change was that White directed main office employees to stop using existing protocols in the handling of incoming ballot applications and ballots. (Investigators' SOF ¶ 56; White's SOF ¶ 36.) In past elections, envelopes

3

arriving at PWOE would be physically date-stamped. (Investigators' SOF ¶ 55; White's SOF ¶ 4.) Instead, in November 2020, White directed that arriving envelopes containing absentee ballots be electronically scanned, registered, and then sent to the Central Absentee Precinct ("CAP") within 24 hours to await pre-processing.[1]  (White's SOF ¶¶ 4–5.)  The CAP was a unique type of precinct set up to receive absentee ballots from across the entire County. (Investigators' SOF ¶ 6; White's SOF ¶ 36.)  During pre-processing, PWOE staff were tasked with checking ballots for curable errors, counting and marking accepted ballots in VERIS, and contacting voters with defective ballots with instructions for curing.  (White's SOF ¶ 5; Ex. 35 at Ch. 12, app'x C at 23–24.)

The PWOE operated a number of different locations during the November 2020 election.  One of White's subordinates, Matthew Wilson ("Wilson"), operated a team of staff out of the main office in Manassas.  (Ex. 60 at 01381, 02208; Ex. 61 at 20516; Ex. 17D at 04304.[2])  Another location was an operations warehouse in Woodbridge.  (Mulligan Dep. at 106; Investigators' SOF ¶ 53; White's SOF ¶ 36.)  A third location was in Ridgewood, and was referred to as the "Call Center."  (Decl. of White ¶ 15, Ex. 31; Mulholland Dep. at 176–77, Ex. 47; Ex. 60 at 01381.)  As election day approached, White moved her regular working space from the Manassas main office to the PWOE's warehouse in Woodbridge, and later moved it to the Call Center in Ridgewood.  (Investigators' SOF ¶ 53; White's SOF ¶ 36.)  In September 2020, White decided that mailed-in or drop box absentee ballots should be

---

[1] ELECT guidance for the 2020 election mentioned digitally scanning envelopes as part of an acceptable practice if the envelope had a VERIS barcode on the return address label.  (Ex. 35, 2020 Handbook, Ch. 12, app'x D; Ex. 36.)

[2] The Court uses the last five (5) page digits of each document for pagination in this Opinion.

brought to her location at the Call Center without first going through the main office. (Ex. 17A at 04286–87; White's SOF ¶ 4.)

Typically, after voting closes for an election in Prince William County, the first step of the canvass involves PWOE employees taking data from tally tapes and recording them on spreadsheets. (White's SOF ¶ 7; Mulligan Dep. at 32–34, 237–39; Ex. 39 at 02150.) In years prior to 2020, this process involved PWOE employee Sean Mulligan ("Mulligan")[3] printing out spreadsheets that contained election night results. (Mulligan Dep. at 237–39.) A series of teams of PWOE employees would compare the spreadsheet printout to the tally tapes. (*Id.* at 238.) Any discrepancies would be marked on the spreadsheets in red ink. (*Id.*) The spreadsheets would then be provided to Wilson to enter the corrected numbers into VERIS. (*Id.*)

In 2020, the canvass process involved PWOE employees entering the tally tape election data into a spreadsheet program such as Microsoft Excel or Google Sheets. (Mulligan Dep. at 32–34; Ex. 39 at 02150.) Detailed tally tapes that included information about votes for congressional candidates were available in at least some Prince William County locations after the November 2020 election. (Ex. 38 at 59; Ex. 39 at 02150; Email from ELECT official, Ex. 40.) Once the employees put the results data onto the spreadsheets, either they would input that data into VERIS or another employee would input the data for them. (Mulligan Dep. at 32–34; Ex. 39 at 02150.) In November 2020, many PWOE employees had access to VERIS and made manual entries. (Mulligan Dep. at 43–44; Ex. 41; Ex. 18F at 06471.) Manual changes to VERIS data were common during the canvass

---

[3] The Court uses what appears to be Mulligan's middle name, "Sean," in lieu of his first name as that is the name he uses in documents in the record. (*See e.g.*, Ex. 61 at 20516; Ex. 19 at 02241.)

period because the format in which voting machines reported votes on the tally tapes did not

match the way VERIS organized the same data. (White's SOF ¶¶ 9–10; Ex. 37 at 99–100.)

### A. Election Discrepancies Discovered

In November of 2021, Eric Olsen became the General Registrar of Prince William

County. In April 2022, he reviewed the results data for the 2020 election. (Olsen Dep. at

24–26.) Olsen compared the tally tapes from the election to the results reported on Virgina's

elections website. (*Id.* at 26–28; Olsen Email, Ex. 6.) He quickly noticed discrepancies in

Prince William County's reported election results. (Olsen Dep. at 26.) First, Olsen noticed

that the results from two precincts in consecutive order had identical numbers, which

indicated someone had committed an error. (*Id.* at 26–27.) Olsen investigated further and

discovered that the reported result totals for eight (8) of 94 precincts did not match the tally

tapes. (Olsen Email at Ex. 6 at 00098; Investigators' SOF ¶ 25; White's SOF ¶ 36.)

Overall, Olsen discovered there was a difference of several thousand votes between

what the tally tapes reported and the results Prince William County certified while White was

General Registrar in 2020. (Olsen Email at Ex. 6 at 00098; Investigators' SOF ¶¶ 25, 28;

White's SOF ¶ 36.) Olsen found that the County reported that Joseph Biden received 1,648

fewer votes and that Donald Trump received 2,327 more votes than what was reflected in the

tally tapes. (Investigators' SOF ¶¶ 25; White's SOF ¶ 36.)

Major errors were present in the CAP's vote totals, where the errors were in round

numbers: Biden had a net undercount of 1,600 votes, and Trump had a net overcount of

2,400 votes. (Investigators' SOF ¶ 25; White's SOF ¶ 36.) Although the discrepancies

totaled several thousand votes, those errors did not affect the outcome of the election. (*See*

Olsen Dep. at 51–52.) Based on what he discovered, Olsen thought that on election night

6

some tally tapes were not printed in the "detailed" form, that those tally tapes did not record vote totals by congressional district, that VERIS required users to input vote totals by congressional district, and, for those reasons, he believed that "somebody went, Oh crap, we didn't do this; now we're going to have to reconstruct it as best—with our best guesswork that we can." (Olsen Dep. at 122–25.)

Olsen reported his findings to the County Electoral Board, along with his opinion that these errors should have been caught during the canvass process. (Ex. 6; Olsen Dep. at 61–62.) He also shared his findings with the SBE. (Olsen Dep. at 70–74.) Olsen called Susan Beals ("Beals"), Virginia's Commissioner of Elections, and explained that Prince William County's certified results for the 2020 election appeared to be incorrect. (*Id.*) Beals then called Joshua Lief ("Lief") at the Office of the Attorney General ("OAG") to discuss Olsen's findings. (Investigators' SOF ¶ 29; White's SOF ¶ 36.)

Following the call with Beals, Lief spoke to Olsen on the phone and received enough preliminary information to present Olsen's findings to the SBE for them to determine whether to authorize an investigation by the OAG. (Olsen Dep. at 214; 218–19.) At the next SBE meeting, Lief spoke about the Prince William County matter in closed session. (Lief Dep. at 215–216, 222–23, Ex. 45.) The SBE voted unanimously to request an OAG investigation. (*Id.* at 223; SBE Meeting Minutes at 00408–09, Ex. 9.)

### B. The Investigation

Mark de Almeida ("Investigator de Almeida" or "de Almeida") and Howard Mulholland ("Investigator Mulholland" or "Mulholland") were assigned as investigators on the Prince William County matter. (Ex. 10; Ex. 11.) Investigator de Almeida had served as a Senior Financial Investigator at OAG since July 2018 focusing primarily on financial

crimes, and, before that, he worked as a Special Agent with the Federal Bureau of Investigation on counterintelligence, counterterrorism, violent crimes, white-collar crimes, and critical incidents. (de Almeida CV; Ex. 12; de Almeida Dep. at 20–22, Ex. 44.) Mulholland likewise had prior experience in law enforcement, working as a Senior Special Agent at the Internal Revenue Service before serving with the OAG beginning in 2004. (Ex. 14; Mulholland Dep. at 9–11, Ex. 47.) When the Investigators began working on the case, they were informed that "there appear to be some discrepancies in the Prince William vote count and they [OAG] wanted [them] to interview the current general registrar and see if there was anything to it, [and] what the available information was." (de Almeida Dep. at 79.)

Investigators de Almeida and Mulholland ran the investigation, and they submitted periodic updates to Lief, the lead OAG prosecutor. (Mulholland Dep. at 30–31; de Almeida Dep. at 32, 86–87; Lief Dep. at 84–85.) During his deposition, Mulholland testified that the Investigators "did not take any direction from him [Lief]" in how they conducted the investigation. (Mulholland Dep. at 30–31.)

The Investigators first interviewed Olsen, the current County General Registrar. (Olsen Memo at 06474, Ex. 18H.) Olsen provided them with insights into Virginia election law and administration. (de Almeida Dep. at 55.) The Investigators "relied on Mr. Olsen's expertise as . . . the registrar to inform [their] pursuit of these discrepancies." (*Id.* at 142; *see id.* at 55 (describing Olsen as "the best resource that [they] had on election matters and how things were supposed to be done.").)

On May 9, 2022, the Investigators interviewed Sean Mulligan, who worked at PWOE during the 2020 election. (Ex. 17B at 04290; *see* Mulligan Dep. at 114–16.) On June 7,

8

2022, Investigator de Almeida sent Mulligan an email that included a Microsoft Excel spreadsheet, and stated, "I'd like to have you look at the attached sheet, particularly the tab called CAP ONLY and see if we can walk through those entries." (Ex. 19 at 02241.) Attached to that email was a spreadsheet that documented VERIS changes that occurred between November 5 and November 11, 2020, with numerous entries made under Mulligan's log-in credentials (the "change log," Ex. 41; White's SOF ¶ 10; Ex. 19). In a draft memorandum summarizing their interview with Mulligan, dated June 10, 2022[4], the Investigators stated that "[a]fter election day, White sat with Mulligan at the warehouse and had him log on to the VERIS system for the purpose of making updates to the reported values" without specifying a date or dates on which this event occurred. (The "June 10 Draft Memo" at 09635–36, Ex. 48; Mulholland Dep. at 263.)

According to the Investigators' deposition testimony, both of them spoke with Mulligan during interviews on two (2) different dates. (de Almeida Dep. at 214–16; Mullholland Dep. at 243–44.) Investigator de Almeida spoke further with Mulligan over the phone on separate occasions. (de Almeida Dep. at 214–16.) The Investigators later summarized the information provided by Mulligan in a memorandum dated May 9, 2022, through July 27, 2022, and which stated that on "November 5th, [2020,] White sat with Mulligan in a large room at the back of the main office" and had him log on to the VERIS system and update reported values. (The "July 27 Memo" at 04290–91, Ex. 17B; Mulholland Dep. at 252–53.)

---

[4] Although White states in her brief that this draft memorandum was "dated July 10, 2022" (White's SOF ¶ 17), the Court found no indication in the record that this is the case. Instead, the two exhibits White cited in support of this statement show that the draft memorandum was actually dated June 10, 2022. (Ex. 47 at 263; Ex. 48 at 09635–36.)

The Investigators interviewed Susan Reed, General Registrar of the City of Manassas, on June 15, 2022, and summarized the interview in a memorandum the same day. (Ex. 18I at 06476.) During the November 2020 election, Prince William County inadvertently received ballots intended for other jurisdictions, such as the City of Manassas. (Investigators' SOF ¶ 63; White's SOF ¶ 36.) The memorandum stated that Reed identified an instance where White had to be prompted to deliver to her ballots that Manassas voters had incorrectly sent to the PWOE. (Ex. 18I at 06476; White's SOF ¶ 56.) Reed called White on election day and asked about misdirected ballots intended for her jurisdiction. (Investigators' SOF ¶ 65; White's SOF ¶ 36.) White acknowledged she had some of those ballots and, by the Friday after the election, had delivered about half a dozen City of Manassas ballots to Reed.[5] (Investigators' SOF ¶ 65; White's SOF ¶ 36.)

On June 29, 2022, the Investigators interviewed PWOE Senior Deputy Registrar Cynthia Martinez ("Martinez") and completed a memorandum summarizing her statements the next day. (Ex. 18K at 06479.) The Investigators recounted that Martinez was supposed to be coordinating all absentee ballot mail-in operations for the November 2020 election, but she felt that she had been "cut out" of the process by White, and she felt that White was eliminating previous procedures in order to save time. (*Id.*) In the week after the election, Martinez was working at the Call Center. (*Id.* at 06840.) She observed mail trays in White's office that contained absentee ballots from both Prince William County and other jurisdictions. (*Id.*) The memorandum summarizing Martinez's interview stated, "As the law in place at the time allowed counting of mailed-in absentee ballots which were postmarked

---

[5] Guidance from ELECT stated that voters had "until noon on the Friday after Election Day" to cure certain errors with their absentee ballots for the November 2020 election. (Ex. 35 at Ch. 12, app'x C.)

by election day and received by noon of the Friday after the election, Martinez knew that if these ballots were not processed almost immediately, before the post-election (CAP-2) machines were closed out, they could never be counted." (*Id.*) Martinez took photographs in White's office that depicted several U.S. Postal Service trays of ballot envelopes, including one labeled "Unmarked or Unused Ballots" and another labeled "Other Locality Ballots." (Ex. 21 at 01382–84; Ex. 50; *Id.*; White's SOF ¶ 24, Ex. 18C at 06463.) Martinez later emailed these photographs to Investigator de Almeida, stating that they were taken on November 24 and that she believed the ballots "should have been at the courthouse" by that time. (Ex. 21 at 01381–84.)

The Investigators interviewed PWOE Assistant Registrar Holly Shupe ("Shupe") on July 6, 2022, and prepared a memorandum summarizing the interview on July 8, 2022. (Ex. 18C at 06461.) According to the Investigators' memorandum, on November 24, 2020, Shupe and Martinez were assigned to the Call Center to answer phone calls. (*Id.* at 06463.) While there, they found U.S. Postal Service trays of absentee ballots and other items in White's office that they believed "had not been processed nor provided to the court as required by law." (*Id.*) Shupe and Martinez took photographs of White's office on that date and provided that material to the Investigators. (*Id.*; Investigators' SOF at ¶ 71; White's SOF ¶¶ 24, 36.)

The Investigators interviewed Leslie Kostelecky ("Kostelecky"), a former PWOE employee, on July 6, 2022. (Ex. 17A at 04286.) The Investigators stated in a July 11, 2022 memorandum summarizing the interview that Kostelecky assisted PWOE employee Colleen Rummel with running the CAP in Prince William County. (*Id.* at 04286–87.) The memorandum stated that although White directed that absentee ballots be sent to the Call

Center (instead of the PWOE main office) before they arrived at the CAP, many ballots arrived at the CAP "without having been screened for possible curing so that the vote could be counted." (*Id.* at 04287.)

On Friday, November 6, 2020, White called Kostelecky to come to the Call Center to retrieve ballots that needed processing, which was appropriate to do for ballots that were post-marked by election day. (*Id.* at 04288; Investigator's SOF ¶ 66; White's SOF ¶ 36.) Kostelecky was "given two green bags with ballots" to process. (Ex. 17A at 04288.) She "noticed and asked about a number of US Postal Service trays of other ballots and mail items stacked in White's office." (*Id.*) According to the memorandum, Kostelecky told the Investigators that White became livid with her, and that Kostelecky took a photograph of the trays of ballots in White's office on that day. (*Id.* at 04288–89.) The photograph was taken at approximately 8:30 a.m. on November 6, 2020. (White's SOF ¶ 25; Ex. 20.) The memorandum further reported that Kostelecky took more photographs of the trays of ballots in White's office on December 9, 2020, when she returned to the Call Center. (Ex. 17A at 04288–89; *see* White's SOF ¶ 23; Ex. 22.) The memorandum stated, "Kostelecky advised she knew the ballots that were left after she took the two green bags, the ones in the 11/6/2020 photo, could not be cured, if needed, as the process of contacting the voter and correcting any problems would have to have been completed that same day by close of business." (Ex. 17A at 04289.) Kostelecky later provided the photographs to the Investigators. (Ex. 20; Ex. 22.)

On July 22, 2022, the Investigators interviewed White. (Ex. 17D at 04301.) The Investigators summarized the interview in a memorandum on July 28, 2022. (*Id.*) According to the Investigators, White stated that the changes she made to procedures within

12

the PWOE were all mandated by the state legislature. (*Id*). White thought that Martinez was creating a lot of "busywork" for her and her staff without keeping up with the applications they received each day. (*Id*. at 04302.) The Investigators reported White as stating that she wrote a disciplinary letter about Martinez "and presented it to the Board" admonishing Martinez, Kostelecky, and others to eliminate unnecessary steps. (*Id*.)

According to the memorandum, when White was shown a photograph of her office that was taken on November 6, 2020, White responded that the photograph must have been taken before November 6 because the office would have been cleared by that date. (*Id*. at 04304–05.) Likewise, White explained that the November 24 and December 9 dates the PWOE employees attributed to their other photographs of White's office were incorrect. (*Id*. at 04305.) White was confident that everything reflected in those photographs was ultimately delivered to the Clerk of Court's office for storage. (*Id*.)

The memorandum further stated that White tasked Mulligan with comparing the canvass numbers with those in VERIS and that she personally observed Mulligan doing the comparison. (*Id*. at 04306.) The Investigators reported that, when she was "asked about the changes made in VERIS under Mulligan's sign-in, White denied having sat with Mulligan and providing the values for those changes." (*Id*. at 04306.)

In total, the Investigators interviewed sixteen (16) individuals. (Ex. 16 at 16–17.) Sometime after each interview, de Almeida worked on a memorandum intended to summarize the conversation with that interviewee. (de Almeida Dep. at 98.) Mulholland would then review the memorandum. (Mulholland Dep. at 78–82.)

The Investigators summarized all their interviews in an eight (8) page memorandum dated July 29, 2022 (the "Summary Report," Ex. 17C). The Summary Report stated, *inter*

*alia*, that Prince William County's election result discrepancies were caused by changes in VERIS that occurred on November 7, 2020. (*Id.* at 04296.) The Summary Report also stated that "Mulligan confirmed that he was present at the Manassas main office on that date," November 7, 2020, "with White and together they initiated changes [in VERIS], with him logged on to the system as the user/creator of the data entered." (*Id.* at 04295.) The Summary Report went on to state, "White denied ever sitting down with Mulligan and giving him numbers to change vote totals in VERIS." (*Id.*) On July 29, 2022, Investigator de Almeida sent the Summary Report and sixteen (16) witness interview memoranda to Lief via email, with Investigator Mulholland carbon copied. (Ex. 17 at 04285; Ex. 18 at 06458.)

### C. Prosecutors Present Indictments to a Grand Jury

Lief reviewed the memoranda, Summary Report, and accompanying materials, such as the VERIS change log and photographs. (Investigators' SOF ¶ 87; White's SOF ¶ 36; Lief Dep. at 287–291.) Lief, along with another OAG prosecutor who reviewed the materials, decided to recommend presenting an indictment against White to a grand jury, and OAG Chief Deputy Chuck Slemp agreed. (Lief Dep. at 101–03.)

In September 2022, three (3) indictments against White were presented to a grand jury. (Ex. 24.) The first was a misdemeanor. (*Id.* at 08075.) It charged that White "did willfully neglect their duty as an officer of an election, member of an electoral board, or other person enjoined by law relative to any election, in violation of Section 24.2-1001 of the Code of Virginia." (*Id.*) The second charged that White "did feloniously engage in corrupt conduct as an officer of an election, member of an electoral board, or other person enjoined by law relative to any election, in violation of Section 24.2-1001 of the Code of Virginia." (*Id.* at 08077.) The third charged that White "feloniously and willfully made a false material

14

statement or entry made in any statement, form, or report required by the 24.2 title of the Virginia Code, in violation of Section 24.2-1016 of the Code of Virginia." (*Id.* at 08075.)

On September 6, 2022, the grand jury heard the allegations and testimony from de Almeida, who was the only witness to testify. (Ex. 24; de Almeida Dep. at 332, 337–39; Mulholland Dep. at 299–300.) The same day, the grand jury returned true bills on all three counts. (Ex. 24; Ex. 25; de Almeida Dep. at 339.) White was arrested the following day. (Ex. 25; de Almeida Dep. at 339.)

Lief initially led the prosecution of White. (Lief Dep. at 379–90.) However, while the case was still pending, Lief left the OAG. (ECF No. 72-28 at 19–20; Lief Dep. at 379–90.) Phil Figura, a Chief Prosecutor in the OAG, then assumed leadership responsibilities over the prosecution. (Lief Dep. at 380–90.)

In November 2023, slightly over one year after the grand jury indictment, Mulligan met with OAG prosecutors and Investigator de Almeida. (Mulligan Dep. at 183–87; de Almeida Dep. at 354–56.) During the meeting, Mulligan recounted how the PWOE had previously conducted elections and he shared his memory of what happened in the County during and immediately after the November 2020 election. (Mulligan Dep. at 183–95; de Almeida Dep. at 355–60.) On December 1, 2023, the two (2) felony charges against White were dismissed *nolle prosequi*. (*Nolle Prosequi* Order, Ex. 26.) The misdemeanor charge was dismissed at the end of that month, on December 29, 2023. (Investigators' SOF ¶ 97; White's SOF ¶ 36.)

White began this lawsuit by filing her Complaint on October 17, 2024, alleging malicious prosecution under 42 U.S.C. § 1983 and under Virginia state law. (Compl. ¶¶ 183–214, ECF No. 1.) White seeks compensatory and punitive damages, a declaration

15

that her rights under the Fourth and Fourteenth Amendments were violated, and attorneys' fees.

### D. Discovery for This Case

Mulligan was deposed on May 5, 2025. (Mulligan Dep. at 2.) He testified that although he was working for the PWOE at the time of the November 2020 election, he was not involved in the canvassing process. (Mulligan Dep. at 56, 235–39.) Mulligan testified that his main responsibility during the election was election night reporting. (*Id.* at 32–35.) Another of his November 2020 election responsibilities was to enter the results in VERIS after the canvass. (*Id.* at 35–36.) Mulligan explained that "there was also the—the results after canvass, which we would canvass the results. Michele [White] and I would enter the results." (*Id.*) He also stated that White normally "would sit next to me and have me put the results in." (*Id.* at 130.) Later in the deposition, Mulligan confirmed that White assigned him the responsibility to make certain changes in VERIS, and that she was there when he did so. (*Id.* at 154–57, 160–61.)

At the time of his deposition, Mulligan believed that PWOE staff were supposed to report data into VERIS by congressional district, even if they were dealing with a split precinct. (Mulligan Dep. at 64, 66–67, 69.) Mulligan also described the November 2020 election as "messy," explaining, "We had—that it was just—we had—it just seemed to be going—everything we did was against the norm, the whole establishing the preprocessing. I think it was just because we were dealing with all the new laws and everything, we were trying to feel out how it was the best way to handle it all. And it was just growing pains." (*Id.* at 71–72.)

Mulligan testified that he remembered that personnel with the OAG questioned him about election discrepancies, but he did not remember what specific discrepancies they spoke with him about. (*Id.* at 64–85.) He stated that the questions he was asked "were mainly dealing with the change log," and so, during the deposition, he supposed that the specific results the Investigators asked him about three (3) years prior were those for the CAP. (*Id.*)

When asked whether the discrepancies that were detected by Olsen in 2022 might have been caused by "an attempt to correctly break out the results by congressional district for split precincts," Mulligan answered, "That's—that would be my assumption, just working in that office." (*Id.* at 89–90.) Mulligan testified that the values in VERIS "were the numbers that were reported to the state." (*Id.* at 113.)

Mulligan also testified that his impression of the first meeting with the Investigators was "to get a better understanding of how the whole [election] process worked" such as how he got "the votes from the precincts, the spreadsheets, everything, how it got into VERIS, all that." (*Id.* at 118.) Mulligan did not remember if Investigator de Almeida specifically asked about the reporting of CAP precinct results into VERIS in that first meeting. (*Id.* at 118–19.) He was not sure if the topic even came up. (*Id.*) During his deposition, he was aware that he had made changes in VERIS, but he did not recall which changes he made. (*Id.* at 123–24.)

Later in the deposition, Mulligan further testified that during his first interview with the Investigators they brought up discrepancies in the election results. (*Id.* at 134–35.) Counsel for White showed Mulligan an email de Almeida sent to Mulligan on June 7, 2022. (*Id.* at 138.) Mulligan recognized the excel spreadsheet attached to the email as the VERIS change log. (*Id.* at 140–44.) He did not recall whether de Almeida asked him about changes made in VERIS on November 5, 2020. (*Id.* at 144.) He also did not know on what dates

17

after the election the VERIS changes were made. (*Id.* at 144–45.) When asked, "Do you recall about which changes in VERIS Mr. De Almeida asked you questions?" Mulligan answered, "I for some reason remember November 7th as the date that he was asking about, but I couldn't be 100 percent on that." (*Id.*) He did not recall going through the change log line by line, instead, he stated, "I remember him bringing up specific ones that were questions to him." (*Id.* at 146.) When he was asked, "Do you recall telling the investigators that you and Ms. White made certain changes on November 5th," he answered, "I don't remember." (*Id.* at 146.) Counsel for White asked Mulligan whether he believed whoever directed him to make certain changes in VERIS after election day wanted him to enter false data, to which he replied, "Absolutely not, no. It never crossed my mind, no." (*Id.* at 147.) Mulligan did recall telling the Investigators that certain changes in VERIS may have been an attempt to break out results from a number of split precincts by congressional district. (*Id.* at 148 ("[T]hat would be my initial thought immediately.").)

When asked whether he was present for certain changes that were made in VERIS on November 7, 2020, Mulligan answered, "I'm not 100 percent sure. I mean, if my name's on the change log, I'm going to assume I was, but I—it's not like I remember being there that day or anything." (*Id.* at 153.) He also did not remember what he told the Investigators about this, that is, he did not remember whether he told the Investigators he was present when those VERIS changes were made. (*Id.* at 154.) Mulligan further stated, "I'm—if my name is on the change log, I'm going to assume I took—took it, like, as me. I wouldn't assume someone was stealing my log-in credentials or anything." (*Id.* at 154.) Counsel for White asked, "[Y]ou cannot recall whether there was anyone kind of directing you to make those changes on November 7, 2020?" Mulligan answered, "I—oh, geez. Directly telling

18

me to change numbers? I don't know. But I—everything I did Michele [White] was aware

about or aware of. I know that much. So if I was doing something, it was never without

Michele's knowledge. That's—that's basically all I can say. The—I don't know if she

directed me to, I mean, specific numbers, change those specific numbers. I—but everything

I did she was aware of." (*Id.* at 154–55.)

Counsel for White asked, "Do you remember whether any—whether Mr. De Almeida

or anyone else from the Attorney General's office specifically asked you who directed you or

may have directed you to make changes on November 7, 2020, or was that a question never

asked to you?" (*Id.* at 155.) Mulligan answered:

> I do remember a question, but this was my hangup then, too, was are you—is
> the question is she specifically directing me to change these specific numbers or
> just in general, she's my boss, she's telling me what to do? Because, yes, she
> always was aware of what I was doing or what was happening and she was right
> next to me. But I don't know if words were specifically spoken. Like I don't—
> I don't—I don't know if the—the—the—the picture that's trying to be painted
> is she knew something was wrong and she's telling me do this. That never
> happened. But she knew what I was doing, if this makes any sense. So that
> questioning, the only reason that sticks with me is because I remember trying to
> explain to them that she knew what I was doing. She knew everything I was
> doing.

(*Id.* at 155–56.) Mulligan also stated, "There was never a time where—she was never telling

me to do something sneakily or behind the scenes or—nothing like that ever happened." (*Id.*

at 156–57.) When asked by counsel, Mulligan did not remember whether the November 7,

2020 changes in VERIS related to the CAP were discussed during his first interview or

during his second interview. (*Id.* at 159–60 ("Right. I—I mean, I don't—I don't remember

if they were—I don't remember which interview was which and what happened

specifically.").)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Harris v. Town of S. Pines*, 110 F.4th 633, 639 (4th Cir. 2024). A material fact is one that might affect the outcome of a party's case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hogan v. Beaumont*, 779 F. App'x 164, 166 (4th Cir. 2019). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. A genuine issue concerning a material fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

As the United States Court of Appeals for the Fourth Circuit has stated, "Where, as here, the nonmoving party bears the ultimate burden of proof at trial, the moving party may discharge its initial burden at summary judgment by 'showing—that is, pointing out to the . . . court—that there is an absence of evidence to support the nonmoving party's case.'" *Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 174 (4th Cir. 2024) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). If the moving party carries this initial burden, then the burden shifts to the nonmoving party to show that a genuine dispute of material fact exists. *Id.* The nonmoving party must establish this by, *inter alia*, "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see Arvon v. Liberty Mut. Fire Ins. Co.*, No. 20-1249, 2021 WL 3401258, at *3 (4th Cir. Aug. 4, 2021) ("[A] court may decide a motion for summary judgment without undertaking an independent search of the record.").

20

In challenging a summary judgment motion, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Reliance on a witness's equivocal statement of fact or lack of memory, "when juxtaposed against" contrary evidence, is typically insufficient. *Eng. v. Pabst Brewing Co.*, 828 F.2d 1047, 1050 (4th Cir. 1987); *see Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735–36 (7th Cir. 2002). Overall, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007) (quoting *Anderson*, 477 U.S. at 249–50).

At the summary judgment stage, the Court views the facts presented by the evidence, and reasonable inferences therefrom, in the light most favorable to the nonmoving party. *United States v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36 F.4th 240, 252 (4th Cir. 2022) (citing *Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018)); *T-Mobile Ne. LLC v. City Council of Newport News*, 674 F.3d 380, 384–85 (4th Cir. 2012). Under Rule 56(c)(3), "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). However, if one party fails to properly address another party's assertion of fact, the court may consider that fact undisputed for purposes of a summary judgment motion. Fed. R. Civ. P. 56(e).

## III. DISCUSSION
### A. Standard for Malicious Prosecution Under Federal and State Law

To prevail on a malicious prosecution claim under 42 U.S.C. § 1983, a plaintiff must prove that the defendant(s) "(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (citing *Durham v. Horner,* 690 F.3d

21

183, 188 (4th Cir. 2012)). "To prove a malicious prosecution claim under Virginia common law, [the plaintiff] must establish that a defendant (1) instituted or procured a criminal prosecution of the plaintiff; (2) without probable cause; (3) acted maliciously; and (4) the prosecution was terminated in a manner not unfavorable to the plaintiff." *Wingate v. Fulford*, 987 F.3d 299, 313 (4th Cir. 2021). Here, the Investigators argue, *inter alia*, that they are entitled to summary judgment because White has not pointed to evidence that could prove at trial that the Defendants were the proximate cause of her seizure and prosecution. (Mem. in Supp. at 20–27, ECF No. 61.)

As the Fourth Circuit has stated, proving causation for a § 1983 malicious prosecution claim requires evidence of "both but-for and proximate causation." *See Evans*, 703 F.3d at 647. Even in circumstances where police officers engaged in misconduct prior to a plaintiff's arrest, "subsequent acts of independent decision-makers (*e.g.*, prosecutors, grand juries, and judges) may constitute intervening superseding causes that break the causal chain between a defendant-officer's misconduct and a plaintiff's unlawful seizure." *Id.* (citing *Zahrey v. Coffey*, 221 F.3d 342, 351 (2d Cir. 2000)). "Such 'intervening acts of other participants in the criminal justice system' insulate a police officer from liability." *Id.* (quoting *Zahrey*, 221 F.3d at 351). However, this principle does not apply to all officer misconduct. If a law enforcement officer lies to or misleads the prosecutor, fails to disclose exculpatory evidence, or unduly pressures the prosecutor to seek an indictment, then the prosecutor's decision to bring criminal charges is not a superseding cause. *Id.* at 647–48 (citations omitted). In sum, "a police officer is not liable for a plaintiff's unlawful seizure following indictment 'in the absence of evidence that [the officer] misled or pressured the prosecution.'" *Id.* (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)).

Similarly, in a Virginia malicious prosecution action, a defendant is not liable for providing, in good faith, information to law enforcement that results in the plaintiff's arrest. *See Brice v. Nkaru*, 220 F.3d 233, 238 (4th Cir. 2000). This is true even if the defendant's information is incorrect. *Id.* (finding that "the critical question" is whether the witness provided his honest or good faith belief of the facts). The Supreme Court of Virginia applied this rule in *King v. Martin*, holding that a witness who provided incriminating information about a suspect to police officers was not liable when that suspect was acquitted and later brought a malicious prosecution action. 142 S.E. 358, 360–61 (Va. 1928) (holding that "the court erred in not setting aside the verdict of the jury and entering judgment for the defendant.").

In *King*, the Supreme Court of Virginia further reasoned that even if the witness in such a situation is, himself, a law enforcement officer, he is still shielded from civil liability. 142 S.E. at 360–61. In deciding *King*, the court cited as a case in point a Rhode Island decision, *Atkinson v. Birmingham. Id.* (citing 116 A. 205 (R.I. 1922)). As described by the Supreme Court of Virginia, the *Atkinson* case began when Sarah Atkinson brought a lawsuit for malicious prosecution against a police officer named George Hindmarsh and several other individuals. *Id.* Officer Hindmarsh's police precinct captain, James Costigan, had received a complaint that Atkinson took paper currency from the victim, Margaret Birmingham. *Id.* Costigan tasked Officer Hindmarsh and another officer with investigating the matter by interviewing both the victim and Atkinson, as well as other witnesses. *Id.* Officer Hindmarsh and another officer did so and reported to Costigan the result of their interviews. *Id.* Costigan later met with the deputy chief of police to request that a criminal complaint be made against the plaintiff charging her with larceny. *Id.*

23

Ultimately, the Supreme Court of Virginia quoted *Atkinson*'s conclusion that Officer Hindmarsh did not initiate a criminal prosecution by reporting witness interviews to his supervisor. *King*, 142 S.E. 361. Summarizing the *Atkinson* decision, the Supreme Court of Virgina stated, "'As to the defendant, Hindmarsh, it appears that his sole connection with the matter was to follow the direction of his superior officer and to report to such superior officer the result of his interviews with the plaintiff and the witnesses, Crown and Todd, and later when summoned as a witness he testified as to such interviews.'" *Id.* (quoting 116 A. at 206) (stating further, "There was no error in the ruling of said justice directing a verdict in favor of the defendants, Birmingham and Hindmarsh."). Given this reasoning, the Court finds that the Supreme Court of Virginia would hold that a law enforcement officer who simply reports witness interviews to a prosecutor does not initiate a criminal prosecution, particularly if there is no evidence of misconduct. *See Brice*, 220 F.3d at 238; *King*, 142 S.E. at 360–61 (citing *Atkinson*, 116 A. at 206).

Here, the Investigators argue that, given these doctrines, they are entitled to summary judgment in their favor. (Mem. in Supp. at 20–27.) They argue that their presentation of witness interviews and other evidence was not the legal cause of White's seizure and prosecution because the OAG prosecutors made the independent decisions to obtain a grand jury indictment against White, to arrest her, and to prosecute her. (*Id.*) Thus, they argue, the independent decisions of the OAG prosecutors insulate the Investigators from civil liability. (*Id.*) Although the Investigators acknowledge that this argument would not hold if they had lied to or unduly pressured the OAG prosecutors, they argue there is no evidence that they engaged in such behavior—or in any other misconduct. (*Id.* at 22–27.) In other words, without evidence of misconduct, White cannot show that the Investigators were the

24

proximate cause of her arrest and prosecution. (*Id.*) Because White fails to point to evidence that demonstrates a genuine issue of material fact as to causation, the Investigators argue, the Court must grant them summary judgment. (*Id.*)

In response, White argues that the Investigators are not entitled to summary judgment on causation because, during their 2022 investigation, they engaged in either intentional misconduct or improperly reckless behavior. (Resp. in Opp'n at 30–33, ECF No. 68.) According to White, there is a genuine dispute as to whether the Investigators presented false evidence to the prosecutors or whether they omitted material exculpatory evidence. (*Id.*)

The base issue here, then, is whether the Investigators falsified or omitted material evidence when they presented their investigation memoranda and attachments to OAG prosecutors. The Court must determine if White has pointed to evidence in the record that shows a genuine issue of material fact on this front. *See* Fed. R. Civ. P. 56(a); *see also Bryant v. Carico*, 616 F. App'x 84, 85 (4th Cir. 2015) (affirming a district court that held that malicious prosecution plaintiffs held the burden to demonstrate that the officer-defendant misled the intervening decision-maker) (citing *Durham*, 690 F.3d at 189).

### B. Whether Evidence in the Record Shows Misconduct by the Investigators

At the summary judgment hearing, counsel for White stated that the key question here is whether the Investigators misrepresented Mulligan's statements in their Summary Report. Specifically, did Mulligan tell them that White directed him to make the VERIS changes on the afternoon of November 7, 2020, that resulted in considerable election results discrepancies? White contends Mulligan made no such statements and declares that she has evidence to support this contention. During oral argument, counsel stated that White could not possibly have directed all of Mulligan's VERIS entries because he performed that work

25

over three (3) days (from November 5 to 7) while White was moving throughout Prince William County, managing various PWOE locations. In addition, White claimed that Mulligan himself testified during his deposition that he could not have told prosecutors that White directed him to make VERIS changes on November 7.

White contends that this issue about Mulligan's statements, as well as several other concerns, shows that there is a genuine dispute of material fact that requires this case to go to a jury trial. However, the Court finds that White's arguments are not supported by evidence in the record. Instead, evidence in the record supports the Summary Report's material statements about Mulligan while no evidence contradicts them. Likewise, although White claims the Investigators engaged in other misconduct, she fails to point to more than a scintilla of evidence or to anything greater than the attenuated construction of inferences piled upon each other. *See Dash*, 731 F.3d at 311. In short, White has not pointed to evidence that shows a genuine dispute of material fact as to causation.

To begin, despite White's argument about the unlikelihood that she sat with Mulligan for three (3) days to personally direct him to make changes in VERIS, the Investigators made no such claim. Instead, the Summary Report told prosecutors that incorrect VERIS changes were made using Mulligan's log-in credentials between 1:33 p.m. and 2:48 p.m. on November 7, 2020. (Ex. 17C at 04295–96.) That memorandum also stated that Mulligan confirmed that he and White together initiated the changes on November 7, 2020, and that White had him log in and enter the data that she gave him. (*Id.*) There is evidence in the record indicating that Mulligan did, indeed, tell the Investigators this information.

According to the Investigators' deposition testimony, Mulligan told them during his interviews that it was White who directed him to input the CAP spreadsheet data into

26

VERIS. (de Almeida Dep. at 227–229, 238–39; Mulholland Dep. at 246, 253–57.)

Investigator de Almeida, who was leading the investigation, testified that Mulligan told them White directed him to make the changes on both November 5 and 7, and Mulholland, who was assisting de Almeida, recalled that Mulligan told them that White directed the changes on November 7. (de Almeida Dep. at 227 ("She [White] directed changes, according to Mr. Mulligan, on both the 5th and the 7th. . . . all the changes on both dates were, according to Mr. Mulligan, directed by Ms. White"), 229 (". . . according to Mr. Mulligan, she [White] directed him to make changes on both the 5th and the 7th."), 238–39 ("In all our conversations, he [Mulligan] indicated on the 5th and the 7th that she was providing the numbers that he was to enter into the system."); Mulholland Dep. at 246 (when asked "So Mr. Mulligan told you that the – that he made the changes on November 7 –" Investigator Mulholland answered, "That's right.").) The Investigators' testimony on this point is supported by the VERIS change log, which shows that Mulligan's log-in credentials were used to make the November 7 changes in question. (Ex. 41; White's SOF ¶ 10.) This evidence goes to show that—far from committing a lie or misrepresentation—the Summary Report reflected Mulligan's statements that White gave him data to enter into VERIS, and that the two of them initiated the VERIS changes on November 7, 2020.

Of course, the Court must consider whether there is another side to the story. The question here is what Mulligan told the Investigators. If the Investigators misrepresented those conversations, then Mulligan could certainly dispute their account. *See* Fed. R. Evid. 602. However, despite White's arguments, Mulligan's testimony raises no such dispute.

Mulligan has little-to-no memory of what details he might have shared with the Investigators during his interviews. He answered, "I don't remember," "I don't recall," and

"I don't know" over 165 times to such questions during his one-day deposition on May 5, 2025. (Mulligan Dep. at 9–243.) Crucially, he does not remember the details that would reveal whether the Investigators misrepresented his interviews in their Summary Report. During his deposition in 2025, and despite numerous attempts by White's counsel to refresh his recollection, Mulligan could not recall whether White directed him to enter the CAP data into VERIS on November 7 or whether that task was directed by someone else—let alone how he answered that question to the Investigators three (3) years earlier. (*Id.* at 154–59, 159, 200–02.) For example, Mulligan stated during his deposition, "Like, I don't know who gave me the numbers, but Michele [White] definitely would have had some idea about them. Like, she would have known what was happening at that given time." (*Id.* at 200.) Likewise, he did not remember whether he told the Investigators that White or someone else directed him to change any specific number in VERIS. (Mulligan Dep. at 154–55 ("I—oh, geez. Directly telling me to change numbers? I don't know. But I—everything I did Michele was aware about or aware of. I know that much.").)

What Mulligan did remember about his interviews appears to corroborate the facts the Investigators asserted in their Summary Report in 2022. Twice during his deposition, Mulligan testified that White assigned him the responsibility to enter canvass results in VERIS for the November 2020 election and that she was present with him when he did so.[6] (Mulligan Dep. at 35–36, 154–57, 160–61.) The usual practice for White and him, Mulligan testified, was that "she normally would sit next to me and have me put the results in." (*Id.* at 130.) Furthermore, Mulligan stated that, for the election in November 2020, "Michele and I

---

[6] Similarly, White testified during her deposition that one of the duties she assigned to Mulligan was inputting changes for the November 2020 election results. (White Dep. at 89, Ex. 58.)

would enter the results," and "she always was aware of what I was doing or what was happening and she was right next to me." (*Id.* at 36, 154–61.)

During his deposition in May 2025, Mulligan did share that he did not believe White was acting maliciously, for example, he did not believe White "knew something was wrong" while supervising him, and he stated that White "was never telling me to do something sneakily or behind the scenes." (Mulligan Dep. at 155–157.) These statements, however, do not contradict what the Investigators reported to OAG prosecutors about Mulligan's and White's actions.

In the final analysis, Mulligan corroborated the Summary Report's claims that White assigned him the role of entering data in VERIS following the 2020 election canvass, that he entered such data on November 7, 2020, that those changes were made with his log-in credentials, and that White was present with him when he made changes in VERIS. Although at the time of his deposition in May 2025 he could not remember who gave him the CAP results data on November 7, 2020, this lapse of memory does not rebut the Investigators' claim as to what Mulligan told them in May 2022.[7] In other words, the Investigators' testimony about what Mulligan told them is not genuinely disputed by Mulligan's inability to remember what he said. *See Eng.*, 828 F.2d at 1050; *Tinder*, 305 F.3d at 735–36.

---

[7] In *Pfaller v. Amonette*, the Fourth Circuit declined to accept a movant's self-serving assertion of fact on a point upon which that party bore the ultimate burden of proof at trial. 55 F.4th 436, 449 (4th Cir. 2022) (declining at summary judgment to credit the movant-physician's testimony that he did not know the correct medical treatment guidelines for a patient referral when the record instead supported an inference that he did indeed know those guidelines). Here, however, White would bear the burden at trial to prove misconduct. Furthermore, even completely disregarding the Investigators' self-serving deposition testimony, the Court finds that the absence of evidence as to what Mulligan told the Investigators about his and White's involvement with the CAP VERIS data on November 7, 2020, cannot sustain a jury finding that those conversations were misrepresented in the Investigators' memoranda.

In addition to her claim about Mulligan's statements, however, White pointed to differences between the November 5 and November 7 dates in the Investigators' memoranda. Specifically, she refers to changes the Investigators made between the June 10, 2022 Draft Memo (Ex. 48 at 09635), the July 27, 2022 Memo summarizing information from Mulligan (Ex. 17B at 04291), and the Summary Report which is dated two days later, July 29, 2022 (Ex. 17C at 04295). She argued, "While the [Summary Report] Memo reports Mulligan as stating White sat with him on November 7, [the Investigators'] earlier interview memo reports she 'sat with' him on November 5, and an earlier draft of that memo identifies no date, only a description more consistent with Mulligan's own memory—that White was with him while he made some changes to VERIS but she did not direct any specific changes." (Resp. in Opp'n at 23.)

In short, the June 10 Draft Memo does not reflect an exact date for the CAP changes in VERIS, the July 27 Memo states the date for those changes was November 5, and the July 29 Summary Report states the date was November 7. Although the Investigators explain that the July 29 Summary Report had the correct date (i.e., November 7) and that the date in the earlier July 27 Memo (i.e., November 5) was a mistake, the Court must view the evidence in the light most favorable to White, the non-moving party. *See T-Mobile*, 674 F.3d at 384–85.

Nonetheless, these changes between the memoranda are not evidence that the Investigators lied to prosecutors or otherwise misled them. On the contrary, the prosecutors were aware of both dates. The record shows that the Investigators submitted both the July 27 Memo and the July 29 Summary Report in the same email. (Ex. 17 at 04285.) White argues that the change between these memoranda "established that Defendants lied to conform

30

Mulligan's facts to their theory of the case" (Resp. in Opp'n at 23), but the changes fail to

support this hypothesis on their own, and White provides nothing to explain why the

Investigators' view of the case would change in the two (2) days between July 27 and July

29.  Stated differently, a reasonable jury could not conclude that the Investigators deceived

OAG prosecutors by submitting these two different memoranda in the same email.

White also raised "the circumstances of prosecutors' dismissal of the charges" as

evidence supporting her claim, but those circumstances are insufficient to sustain a

conclusion that the Investigators committed misconduct. (*See* Resp. in Opp'n at 24.)  White

contends, "A jury is entitled to weigh evidence that prosecutors were compelled to drop the

charges when Defendants' lie about the key statements [from Mulligan] was exposed." (*Id.*)

A conclusion that the Investigators must have lied in their memoranda cannot be reasonably

inferred from the prosecutors' exercise of discretion to dismiss charges over one (1) year

after they were filed—particularly when leadership responsibilities for the prosecution

changed hands during the development of the case. (Lief Dep. at 380–90.)  The only

evidence White cites in her favor here is Mulligan's testimony stating, "I don't believe its

true, no," when prompted by White's counsel to confirm that "it is not true that you provided

different versions of events during the investigation before and after Ms. White's

indictment," but Mulligan later specified that his memory is not clear and he does not

remember what specific questions were asked after White's indictment. (Mulligan Dep. at

21, 191.)  Under these circumstances, White has not shown that a reasonable jury could find

by a preponderance of the evidence that the Investigators lied to prosecutors about

Mulligan's statements.

31

Finally, although White claims that several pieces of material information were withheld from OAG prosecutors, the record reveals that either this information was, in fact, explicitly provided, that it was stated—but in a format White did not prefer, or that it was not material to the prosecutors' decision to initiate criminal charges.

To start, White takes issue with the Summary Report's statement that "[o]nly a few members of the staff have log-ins that enable them to make changes to the counts in VERIS including then GR White and Sean Mulligan." (Summary Report at 04294.) It appears that the crux of White's criticism here is that the Summary Report did not explicitly state that Kostelecky and Rummel also had access to VERIS. (Ex. 17A at 04288; Ex. 18F at 06471.) Yet, the Investigators did not conceal this information from the prosecutors. Instead, the fact that Kostelecky and Rummel had access to VERIS is visible in the Investigators' memoranda summarizing their interviews with those two PWOE employees—memoranda the Investigators provided to the prosecutors along with the Summary Report on July 29, 2022. (Ex. 17A at 04288; Ex. 18F at 06471.)

Other alleged misconduct White relies on includes: (1) that the Investigators knew, but withheld, Eric Olsen's opinion that the VERIS changes did not appear criminal or intentionally wrongful (Resp. in Opp'n at 25); (2) that the Investigators allegedly misrepresented the nature of the photographs of absentee ballots in White's office (Resp. in Opp'n at 26); and (3) that the Investigators did not tell prosecutors that some of the witnesses they relied upon had been disciplined by White for failing to follow election rules (Resp. in Opp'n at 29). However, White's arguments on these points are not supported by the record.

First, whether the incorrect VERIS changes were chargeable as criminal acts was a determination for the prosecutors to make, and therefore, it was not improper for the

Investigators to leave out Olsen's assessment of criminal liability.  Moreover, the Investigators did not represent Olsen as stating that the erroneous VERIS changes were intentional. (Ex. 18H.)  Instead, in their summary of their conversations with Olsen, the Investigators presented Olsen's example of how unintentional conduct would cause the election result discrepancies at issue. (*Id.* at 06475.)  In short, although the memoranda do not read in the manner White prefers, she has not pointed to evidence that shows the Investigators intentionally or recklessly misrepresented Olsen's statements or omitted material information.

Second, the Investigators did not lie or misrepresent evidence by presenting statements and photographs from PWOE employees concerning absentee ballots and ballot envelopes.  As reflected in the memoranda summarizing statements from Kostelecky, Shupe, and Martinez, these witnesses saw trays of absentee ballots and ballot envelopes in White's office at the Ridgewood Call Center on various dates. (Ex. 17A at 04288–89; Ex. 18C at 06463; Ex. 18K at 06480).  The interview memoranda also reflect that these witnesses took photographs of White's office, some taken shortly after election day, on November 6, 2020, some much later, on November 24 and December 9, 2020. (Ex. 17A at 04288–89; Ex. 18C at 06463.)  The OAG prosecutors then reviewed these materials before deciding to pursue an indictment against White. (Investigators' SOF ¶ 87; White's SOF ¶ 36; Lief Dep. at 101–03, 287–291.)

White does not point to any evidence showing that the Investigators misrepresented what these witnesses reported during their interviews. (*Compare* White's SOF ¶¶ 24–26, 31, 36, *with* ¶ 46 (citing White's Declaration ¶ 16, Ex. 31 (stating that White followed state guidance and that ballots depicted in the witnesses' photographs "were not countable or

curable by Prince William County")).)  Instead, she primarily takes issue with the Summary

Report's statement that, while most of White's modifications to election processes could be

explained by statutory changes, the "investigation revealed additional issues regarding the

possible improper handling of absentee ballots by then GR Michele White."  (Summary

Report at 04293–94.)  However, the Summary Report then stated that, in response to these

issues, the Investigators conducted numerous witness interviews and document reviews and

that, while the memorandum provided findings, it was "not intended to replace the actual

witness reports of [the] interview[s]."  (*Id.* at 04294.)  The Summary Report summarized

those witness interviews, and following most of the blocks of information, the memorandum

included one or more of White's statements on that topic.  For example, the Report included

a summary of Kostelecky's statements that she saw ballots in White's office on December 9,

2020, that she knew had been left from November 6 that year and that she took photographs

of the trays of ballots on both November 6 and December 9.  (*Id.* at 04299–04300.)  This

summary was followed by White's statements that she remained certain that all ballots were

properly processed, secured, and turned over to court personnel.  (*Id.*)  In her brief, White

goes on to argue that it was entirely appropriate for the ballots and ballot envelopes depicted

in the photographs to be present in White's office because they were invalid or otherwise

uncountable.  (Resp. in Opp'n at 26–27.)  But that does not answer the question of whether

the Investigators misled the prosecutors about what the witnesses observed and recorded.

Ultimately, several witnesses within the PWOE believed White's behavior regarding

the storage and processing of absentee ballots was suspicious, or at least unusual.  (Ex. 17A

at 04288–89; Ex. 18C at 06463; Ex. 18K at 06480.)  Despite what the witnesses believed, the

Summary Report stated that White remained certain that all ballots were properly processed

and secured.  (Summary Report at 04300.)  The investigators presented all these statements and related photographs to OAG prosecutors in both the Summary Report and the memoranda that the Investigators had completed after each interview with the witnesses. (Ex. 17 at 04285; Ex. 18 at 06458.)  Therefore, the Summary Report's declaration that "issues regarding the possible improper handling of absentee ballots" led the Investigators to conduct "witness interviews and document reviews," a declaration that was then followed by seven (7) pages summarizing witness interviews and statements by White, does not go to show that the eight (8) page Summary Report deceived the prosecutors.  (Ex. 17C at 04293– 04300.)  Overall, the Investigators' summary and presentation of the witness statements along with the related photographs does not contribute to a finding that they intentionally lied to or otherwise misled OAG prosecutors.

Third, no evidence shows the Investigators concealed White's disciplinary actions against PWOE employees.  In her brief, White points out that she wrote a disciplinary letter about Martinez, Wilson, and Kostelecky, admonishing them to eliminate unnecessary steps when processing absentee ballot applications.  (Resp. in Opp'n at 9, 29 (citing Ex. 17D at 04301–02).)  However, the Investigators clearly informed the prosecutors about this letter as the evidence upon which White relies is Exhibit 17D—the White interview memorandum that was sent to OAG prosecutors on July 29, 2022.  (Ex. 17D at 04302 (informing the prosecutors that "White advised she wrote a disciplinary letter about Martinez" and that "Matthew Wilson and Leslie Kostelecky" were also required to sign it).)  In short, this information was not hidden from OAG prosecutors at all.  Instead, it was declared to them.

Finally, White cites cases to support her argument that, in the aggregate, there are enough disputes in this case that the Investigators' summary judgment motion should be

35

denied. However, the cases upon which she relies are factually distinct. White cited *Harris v. Town of S. Pines*, where police officers did not disclose their "'prosecution summary' containing initial discovery of all information that the officers' investigation uncovered" to prosecutors until two (2) weeks after the state grand jury returned an indictment and was not passed along to federal prosecutors until after the federal grand jury returned a superseding indictment. 110 F.4th 633, 643–44 (4th Cir. 2024). In that case, the police officers claimed they had probable cause that a man named Harris, Sr. was responsible for contraband found in a Cadillac because Harris, Sr. possessed the keys to that vehicle, it was registered to him, and it was parked outside his house. *Id.* The Fourth Circuit held that the finding of probable cause "was tenuous to begin with" and that "that finding would have been undermined by the evidence that Harris, Jr. [another suspect] was seen at the Cadillac, that he was a known drug dealer, and that the packaging of the drugs matched packaging of cocaine found at the home of Harris, Jr.'s supplier." *Id.* This was information the prosecutors did not have when they initiated charges. *Id.* Thus, the Court concluded that this evidence was exculpatory, that it was material to the finding of probable cause, and thus, its omission by police officers misled prosecutors into bringing a criminal case against Harris, Sr. *Id.*

The facts here are clearly distinct. In the case at bar, the Investigators provided their Summary Report, as well as their witness interview memoranda and attachments, to prosecutors *before* criminal charges against White were initiated. Furthermore, as discussed above, the Investigators' materials did not include falsified evidence or omissions of exculpatory evidence. In short, the *Harris* decision does not guide this Court to find that the Investigators misled OAG prosecutors.

36

White also cited *Goodwin v. Metts*, but that case likewise does not support her position. 885 F.2d 157 (4th Cir. 1989). The pertinent malicious prosecution defendant in *Goodwin*, Vernon Maxwell, was an investigating officer in a criminal case against two defendants for a break-in at the residence of Ralph Bishop. *Id.* at 159. Between the criminal defendants' arraignment and trial, Maxwell learned that the main witness, the one whose statement had supported the original arrest warrant against the defendants, provided a false name and address such that he could not be located prior to trial. *Id.* In addition, one (1) month before trial, a man named Michael Stafford was arrested in a neighboring jurisdiction and confessed to a series of break-ins at Bishop's residence. *Id.* Critically, despite learning this exonerating information after criminal charges had been filed, Maxwell did not inform the individuals prosecuting the defendants' case that he had connected Stafford, a third-party, with the Bishop break-in. *Id.* at 159–160. On those facts, the Fourth Circuit held, "A jury reasonably could find that his [Maxwell's] actions and omissions caused the two men unfairly to be subjected to a criminal trial." *Id.* at 162–63.

Just as with *Harris*, *Goodwin* is easily distinguished from the facts here. After the OAG prosecutors decided to bring criminal charges, the Investigators engaged in no further fact finding. (de Almeida Dep. at 350–54; Mulholland Dep. at 308–12.) No evidence shows that the Investigators discovered any new or exculpatory information about the case after they provided their various memoranda to the prosecutors on July 29, 2022. Investigator de Almeida was present with Mulligan during his meeting with OAG prosecutors in November

2023, but evidently, the prosecutors heard what was said there.  Therefore, *Goodwin* also provides no support for White's position.[8]

Because White points to no evidence, either individually or in the aggregate, that creates a genuine dispute of material fact as to whether the Investigators lied to OAG prosecutors, or engaged in other similar misconduct, case law from the Fourth Circuit and the Supreme Court of Virginia establishes that White cannot prove the element of causation for her claims. *See Evans*, 703 F.3d at 648–49; *Brice*, 220 F.3d at 238; *King*, 142 S.E. at 360–61 (citing *Atkinson*, 116 A. at 206).  Given that White does not have sufficient evidence upon which reasonable jurors could return a verdict in her favor, the Court must grant the Investigator's motion for summary judgment.  *See* Fed. R .Civ. P. 56(c); *Mead v. Shaw*, 716 F. App'x 175, 178 (4th Cir. 2018) (per curiam) (affirming grant of summary judgment where there was no genuine dispute of material fact regarding false or misleading evidence).  Furthermore, because the Investigators are entitled to summary judgment on the issue of causation, the Court will deny their Motion to Exclude White's Expert Witness (ECF No. 66) as moot, and it will not address the other grounds the Investigators raised in their summary judgment motion, specifically those based solely on qualified immunity or probable cause.[9]

---

[8] Although White also mentioned *Amisi v. Brooks* in her brief and during the hearing, she did so to support her argument that the Investigators are not entitled to qualified immunity, rather than in response to the causation arguments. *See* 93 F.4th 659, 664 (4th Cir. 2024). In any case, the facts in *Amisi*—about a corrections officer who performed a strip search of a prison employee she mistakenly believed was an inmate—are drastically dissimilar from those here. *Id.* at 664–68.

[9] White also stated in her brief that she intends to preserve her argument that this Court should delay ruling on summary judgment until after the completion of her petition in state court that seeks disclosure of grand jury materials. (Mem. in Opp'n at 33–34.) As stated in the Court's prior Memorandum Order on this topic, and for the reasons stated therein, "although the Court will respect the state court's decision, it will not wait for it." (Mem. Order at 5, n.2, ECF No. 59.) As that Memorandum Order further explained, "If the state court allows the disclosure of the grand jury materials," and if that new evidence materially supports White's claims, then she may request relief from a judgment or order in this case based on "newly discovered evidence." (*Id.* (citing Fed. R. Civ. P. 60).)

*See Bryant*, 616 F. App'x at 85 (affirming a district court's grant of summary judgment on grounds of causation without explicitly addressing qualified immunity.)

## IV. CONCLUSION

When former County General Registrar White brought this malicious prosecution lawsuit against Investigators de Almeida and Mulholland, she alleged that they falsified evidence against her while investigating election result errors. (Compl. ¶¶ 8–12, 114, 139–59.) She theorized that the Investigators lied about what one of White's subordinate election office employees told them during his interviews and that they failed to report exonerating information they learned from other witnesses. (*Id.* ¶¶ 10, 139–59; Resp. in Opp'n at 6, 13, 23–26.)

At this stage and posture of the case, White is required to provide evidence to support her theory. That is, she must point to evidence in the record sufficient for reasonable jurors to find in her favor without resorting to speculation. *See Anderson*, 477 U.S. at 252; *Dash*, 731 F.3d at 311. She has failed to do this. White presented the deposition testimony of the election employee upon whom her theory of the case relies, but that employee does not remember the facts that White claims substantiate her case. She then pored over the Investigators' memoranda and attachments that they submitted to OAG prosecutors, highlighting some discrepancies between the documents and claiming material information was omitted. However, as described above, White's framing of the evidence in her arguments does not match what is in the record before the Court, and much of the evidence that she claimed the Investigators omitted was in fact not omitted at all. What the record instead shows is that the County's November 2020 election results were misreported by several thousand votes, the Investigators were tasked to review those errors, they interviewed

39

witnesses, collected evidence, summarized the available information as they understood it, and sent the materials to OAG prosecutors.

Law enforcement officers are not liable for malicious prosecution in cases where a grand jury or prosecutor made an independent decision that there was probable cause for criminal charges. *See Evans*, 703 F.3d at 648–49. However, this rule does not apply if those officers deceived the prosecutor, omitted exculpatory evidence, or otherwise tainted the prosecutor's independent judgment. *Id.* If White had evidence sufficient for reasonable jurors to find that the Investigators falsified evidence against her, as she alleged in her Complaint, then the Investigators could have been deemed to have caused her prosecution. She does not have such evidence here, however. The record does not show that there is a genuine dispute about such misconduct in this case. Consequently, Investigators de Almeida and Mulholland are entitled to summary judgment in their favor.

An appropriate Order will accompany this Memorandum Opinion.

Henry E. Hudson
Senior United States District Judge

Date: August 26, 2025
Richmond, Virginia